RICHARD H. CLOSE (Bar No. 50298)
rclose@gilchristrutter.com
THOMAS W. CASPARIAN (Bar No. 169763)
tcasparian@gilchristrutter.com
KEVIN M. YOPP (Bar No. 218204)
kyopp@gilchristrutter.com
GILCHRIST & RUTTER
Professional Corporation
Wilshire Palisades Building
1299 Ocean Avenue, Suite 900
Santa Monica, California 90401-1000
Telephone: (310) 393-4000
Facsimile: (310) 394-4700

MATTHEW W. CLOSE (Bar No. 188570)
mclose@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorneys for Plaintiff
Colony Cove Properties, LLC

FILED

2008 OCT 27  AM 11:02

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PA
(JWJx)

| | |
|---|---|
| COLONY COVE PROPERTIES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 50, inclusive;<br><br>Defendants. | CASE NO. CV08-07065<br><br>**COMPLAINT**<br><br>1.  **Violation of the Due Process Clause of the Fourteenth Amendment (Facial) (Under 42 U.S.C. § 1983)**<br>2.  **Violation of the Due Process Clause of the Fourteenth Amendment (As-Applied) (Under 42 U.S.C. § 1983)**<br>3.  **Violation of the Takings Clause of the Fifth Amendment (Facial) (Under 42 U.S.C. § 1983)**<br>4.  **Violation of the Takings Clause of the Fifth Amendment (As-Applied) (Under 42 U.S.C. § 1983)**<br><br>**(Caption continued on next page)** |

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

164608
4541-023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5.  **Violation of the Equal Protection Clause of the Fourteenth Amendment (Facial) (Under 42 U.S.C. § 1983)**

6.  **Declaratory Relief**

7.  **Writ of Administrative Mandate (Under Cal. Civ. Proc. Code § 1094.5)**

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

COMPLAINT

1    Plaintiff Colony Cove Properties, LLC ("Colony Cove") for its Complaint

2    against the City of Carson and the City of Carson Mobilehome Park Rental Review

3    Board (sometimes collectively, the "City") alleges as follows:

4    **JURISDICTION AND VENUE**

5        1.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, 2202,

6    and 42 U.S.C. § 1983. This Court has supplemental jurisdiction under 28 U.S.C.

7    § 1367 in that the pendent state law claim made under Section 1094.5 of the

8    California Code of Civil Procedure arises from the same case or controversy as

9    Colony Cove's federal claims.

10       2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because

11   the City is located within this district, and a substantial part of the events and/or

12   omissions giving rise to Colony Cove's claims occurred in this district.

13   **NATURE OF THE ACTION**

14       3.    This action seeks to have the City of Carson's irrational and

15   confiscatory rent control scheme declared unconstitutional. In addition, this action

16   seeks judicial review of the irrational and arbitrary manner in which the City

17   ignored the evidence and law when it disposed of Colony Cove's recent rent control

18   application.

19       4.    Although in theory some regulation of rents can pass constitutional

20   muster, the City's rent control scheme goes well beyond permissible regulation, and

21   must be stricken down. In fact, the City's rent control law does not even come close

22   to resembling a constitutional system and is one of the most – if not the single most

23   – restrictive and confiscatory rent control laws in the state, if not the country.

24       5.    The City's rent control scheme targets mobilehome parks in the City,

25   where Colony Cove owns a 404-space mobilehome park. As a direct result of the

26   City's confiscatory and irrational rent control law:

27

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

-1-

COMPLAINT

- During the eleven-year time span ending in 2005, the City allowed rents to grow by only 9%, while over the same eleven-year period, the inflation rate was 32.5%;
- Colony Cove residents are paying approximately half the rent they would otherwise be paying if Colony Cove were permitted to charge market rate rents (average rent at Colony Cove is approximately $400 when market rents would be in excess of $800);
- Because the value of a mobilehome park depends upon the amount of rent charged for spaces, the City's rent control law deprives Colony Cove of over $30 million of property value; and
- This value is directly transferred to Colony Cove residents, who on average have been receiving more than $118,000 for their mobilehomes that on average have an appraised value of approximately $33,000.

6.    Because these inflated sales prices are the direct result of the City's rent control scheme, the City effectively takes property value from park owners and gives it to park residents.  The law is well-settled, however, that taking property from party A to give to party B is unlawful and unconstitutional.  *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005).

7.    The City's rent control scheme is also unconstitutional because it fails to permit park owners to charge reasonable rents and receive a fair return on their investment.  Although the City is fully aware that it must permit park owners to earn a fair return, the City is politically committed to keeping rents unconstitutionally low to appease the City's politically powerful mobilehome park residents.

8.    Indeed, the City crafted its rent control law to frustrate rent increases and keep rents as low as possible.  Rather than permitting an automatic increase based on a consumer price index to keep pace with inflation (like many rent control regimes), the City's rent control scheme requires a park owner to prepare and submit a rent increase application – at great time and expense – to obtain any rent increase.

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

-2-

9.    For those park owners that undertake this burdensome odyssey, however, a fair return is still elusive, and park owners are not permitted to charge rents that come anywhere close to market rate rents. As shown in this case, once an owner invests the time and expense to prepare the economic and expert information needed to support a rent increase application, the City then delays consideration of the application until finally disposing of it irrationally and unjustifiably. The record in this action shows that the rent increase application procedure in the City is a sham and a pretext that is not designed to, and in fact does not, yield constitutional rents.

10.    In September 2006, Colony Cove submitted an application for a rent increase to the City on the grounds that it was not receiving a fair return. A mountain of evidence showed that Colony Cove was operating at a loss of over $1 million per year and a rent increase of approximately $200 per month, per space was constitutionally required. Despite this overwhelming and compelling evidence, City staff initially recommended a $15.65 per month, per space rent increase.

11.    Nearly a year later (with Colony Cove continuing to operate at a $1 million per year loss during this delay), the City finally made a decision on Colony Cove's rent increase application. Although the City granted a $36.74 per month, per space increase instead of the $15.65 recommended by staff, this amount was equally unsupportable, unreasonable, and still fails to provide Colony Cove with a fair return on its investment. Indeed, even with this $36.74 increase, Colony Cove will continue to operate at a loss. The record will show that the City was essentially picking numbers at random when it authorized this inadequate rent increase.

12.    Despite this patently unreasonable and unconstitutional conduct by the City, California law would have Colony Cove keep trying to convince the City of the error of its ways by submitting further rent increase applications to the City seeking an adjustment that is supposed to compensate Colony Cove for the City's unconstitutionally restrictive rent setting. As described in more detail below, this

LAW OFFICES
GILCHRIST & RUTTER
A PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

COMPLAINT

1  affords Colony Cove no remedy at all and utterly deprives Colony Cove of its

2  constitutional rights.  Therefore, Colony Cove has brought this case in this Court

3  under 42 U.S.C. § 1983 to vindicate its constitutional rights that are being trampled

4  under state and local law.

5        13.    This action seeks to have the City's rent control scheme declared

6  unconstitutional under § 1983, on its face and as-applied, because it violates Colony

7  Cove's due process rights, constitutes an unlawful and/or an uncompensated taking

8  of Colony Cove's property, and violates Colony Cove's equal protection rights.

9  This action also seeks over $34 million in damages from the City for the unlawful

10 and unconstitutional application of its rent control scheme.  At the very least, this

11 action seeks to compel the City to permit a reasonable rent increase of $200 per

12 month, per space, rather than the meager $36.74 rent increase granted by the City,

13 which is unreasonable and does not provide Colony Cove with a fair return on its

14 investment.  Even with this $200 per month, per space rent increase – which is

15 constitutionally required – the rents at Colony Cove would still be well-below

16 market rates.

**PARTIES**

17

18       14.    Colony Cove is a Delaware limited liability company and the owner of

19 Colony Cove Mobile Estates, a luxury mobilehome park located at 17700 S. Avalon

20 Boulevard, Carson, California 90746 (the "Park").  Constructed in 1975, the Park is

21 one of the most luxurious mobilehome parks in the City of Carson, providing its

22 residents with amenities including a large, central clubhouse-style building with a

23 kitchen, banquet room/auditorium, swimming pool, Jacuzzi, billiards/card room,

24 library/television room, exercise room, indoor spa and a laundry room.  A

25 recreational vehicle storage area is available, and the residents may rent spaces at an

26 additional cost.  A pet exercise run is provided for residents' use.  Gated security

27 services are provided on a 24-hour basis.  Water, sewer, and trash collections

28 services are also provided for the residents.  The Park has 404 spaces (also known as

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

-4-

1   lots or pads) available for mobilehomes, 403 of which are rented to residents.  One

2   space is provided for the Park's manager.

3       15.    Defendant City of Carson is a municipal corporation located within the

4   State of California and in the County of Los Angeles.

5       16.    Defendant City of Carson Mobilehome Park Rental Review Board (the

6   "Board") is a public administrative body created by the City's Mobilehome Space

7   Rent Control Ordinance to hear and determine applications of property owners for

8   rent adjustments.

9       17.    Colony Cove is unaware of the true names, involvement, or capacities,

10  whether individual, corporate, associate, or otherwise, of Defendants Does 1 to 50

11  (the "Doe Defendants"), and therefore sues them by such fictitious names.  Colony

12  Cove is informed and believes, and based upon such information and belief alleges

13  that each of the Doe Defendants is responsible for the actions described herein, has

14  conspired with the other Defendants herein, was the agent, servant, employee, or

15  alter ego of the remaining Defendants, or is otherwise responsible for the

16  complained of actions.  Colony Cove will amend this Complaint when it learns the

17  true names, involvement, and capacities of the Doe Defendants.

**FACTUAL BACKGROUND**

18

19  **A.    The City of Carson's Confiscatory Rent Control Scheme**.

20      18.    In 1979, the City enacted a rent control ordinance, thereafter amended

21  from time to time, known as the Mobilehome Space Rent Control Ordinance (the

22  "Ordinance").  The stated purpose of the Ordinance was to combat rapidly

23  increasing mobilehome rents created by a serious shortage of mobilehome rental

24  spaces.

25      19.    Among other things, the Ordinance created the Board, which was

26  delegated the authority to receive, hear, and determine applications for rent

27  increases.

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

COMPLAINT

20.    In addition to the Ordinance, the City has adopted Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance (the "Guidelines" and collectively with the Ordinance, the "Rent Control Scheme") to be followed by the Board in acting upon applications for rent increases by owners of mobilehome parks subject to the Ordinance.

21.    The Board has no discretion with respect to the Guidelines.  Although styled as "Guidelines," these provisions of the City rent control law are mandatory and must be followed by the Board.  The Guidelines have had the same de facto and de jure force and effect as actual amendments to the Ordinance, and the Board and City staff treats them as such.

22.    The Rent Control Scheme was substantially amended on October 31, 2006.

23.    Mobilehome parks in the City are the only properties subject to the City's Rent Control Scheme.  No other rental property types (e.g., apartments, houses, and condominiums) in the City face any rent control measures.

24.    The City's Rent Control Scheme is among the most restrictive and confiscatory in the nation.  The Ordinance and the Guidelines have erected such overwhelming procedural and substantive hurdles that mobilehome park owners in the City cannot earn a fair return on their investment.  And the Rent Control Scheme keeps getting more onerous, irrational, and confiscatory.

25.    The procedural obstacles are manifest.  Rather than permitting an automatic increase based on a consumer price index to keep pace with inflation (like many rent control regimes), the City's Rent Control Scheme requires a park owner to prepare and submit a rent increase application – at great time and expense – to obtain any rent increase.

26.    Park owners in the City fare no better on the substantive issues involved with rent control determinations.  City staff and the Board routinely

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000  •  FAX (310) 394-4700

COMPLAINT

1  manipulate mobilehome parks' expenses and income in an effort to reduce the

2  allowable rent increase under the Rent Control Scheme.

3      27.    At every turn, the City irrationally, arbitrarily, and capriciously sides

4  with the residents of the City's mobilehome parks to deny park owners a fair and

5  reasonable rate of return.  The City's mobilehome park residents are a key,

6  important, and influential political constituency in the City.  A recent *Daily Breeze*

7  newspaper article discussed the mobilehome-park-resident vote in an article about

8  the successful opposition to a recall by the City's Mayor, Jim Dear.

9           1.   General Rent Increase Applications

10      28.    The Rent Control Scheme permits a park owner to file an application

11  for a general rent increase with the City.  The Board must then grant such increases

12  "as it determines to be fair, just and reasonable."  In making its decision on a general

13  rent increase, the Board must consider eleven factors articulated by the Ordinance,

14  as well as any other relevant factors, and no particular factor is supposed to be

15  dispositive.

16      29.    In addition to the eleven factors, the Rent Control Scheme provides for

17  various quantitative methodologies to the City to determine the amount of a rent

18  increase and also purports to take return on investment into account.  Although the

19  Board has discretion in the selection of methodologies, it may not apply any

20  methodology not authorized by the Rent Control Scheme.

21      30.    On October 31, 2006, the City Council adopted Resolution No. 06-149

22  (the "2006 Amendments"), which constituted a substantial modification of the

23  previous Rent Control Scheme, caused a reduction in the value of the Park, and

24  interfered substantially with Colony Cove's reasonable, investment-backed

25  expectations.  Among other changes, the 2006 Amendments added distinct

26  provisions that authorize a completely new quantitative approach to determining

27  rent increases – the so-called maintenance of net operating income analysis (also

28  known as an "MNOI" analysis).  The maintenance of net operating income analysis

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

-7-

1    does not consider a park owner's interest expenses or take them into account in
2    determining an appropriate rent increase.

3         31.    In addition, the maintenance of net operating income analysis as
4    performed by the City differs from the maintenance of net operating income analysis
5    that is generally accepted in rent control jurisdictions.  It is a maintenance of net
6    operating income analysis in name only, and is merely another sham tool used by
7    the City to deprive park owners of appropriate and necessary rent increases.

8         32.    A genuine maintenance of net operating income analysis, and the
9    approach used in other cities, looks at a park's net operating income (sometimes
10   referred to as "NOI") before the enactment of rent control to establish a base period.
11   This is based on the premise that, because park owners were free to charge market
12   rents before rent control was enacted, they are presumed to have been obtaining a
13   fair return on their investment at that time.  Here, that means that the proper base
14   period for a maintenance of net operating income analysis is 1978, the last full year
15   of expense data available before the City first enacted rent control measures in 1979.

16        33.    To properly perform a maintenance of net operating income analysis,
17   one takes the net operating income during the pre-rent-control base year and adjusts
18   (or indexes) that pre-rent-control net operating income to present dollars based on
19   the inflation rate during that timeframe.  The result is a target current net operating
20   income.  If the inflation-adjusted net operating income is greater than the park's
21   actual present net operating income, there is a rent shortfall, and the park is not
22   earning a fair return because inflation has eroded the park's income in real dollars.
23   This pre-rent-control base year maintenance of net operating income analysis is the
24   maintenance of net operating income analysis discussed and accepted by scholarly
25   literature and case law.

26        34.    The City's Rent Control Scheme purports to be based on the premise
27   that a pre-rent-control base year is an essential part of the maintenance of net
28   operating income analysis.  Section IV(A) of the Guidelines provides that

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000   FAX (310) 394-4700

COMPLAINT

"The Ordinance is based on the assumption that the rents in effect before the adoption of the Ordinance provided a fair return and park owners attempted to rebut that presumption when they first applied for an increase."

35.    In practice, however, the City has refused to use pre-rent-control net operating income to anchor its maintenance of net operating income calculation. Instead of pre-rent-control net operating income, the City uses the park's net operating income from the last year that it granted the park owner a rent increase as a base period.  This does not result in a genuine maintenance of net operating income analysis – it results in a nonsense calculation.  The whole point of the maintenance of net operating income analysis is to ground the calculation in net operating income before rent control took effect to provide an indication of whether a park owner is presently receiving a fair return.  Indeed, the City's Rent Control Scheme explicitly depends on this assumption.  Therefore, as performed, the City's maintenance of net operating income analysis gives no indication of whether a park is earning a fair return because it is not grounded in a timeframe that in theory provides a fair return.  Instead, the Rent Control Scheme locks in and builds on the depressed, restricted, and unlawfully low rents and net operating income assumptions created by this flawed and artificial maintenance of net operating income methodology, and never determines whether the park owner is receiving a fair return.

36.    The City's artificial maintenance of net operating income methodology is further exacerbated by the fact that it adjusts the net operating income in an arbitrarily-selected base year by less than 100% of the inflation rate.

37.    While the consumer price index ("CPI") is a commonly accepted measure of the inflation rate used by federal governmental entities and agencies, it is *un*-common, if not unheard of, for those entities and agencies to adjust for inflation at less than the full 100% rate of inflation.  Government agencies routinely

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

COMPLAINT

1  recognize that, to keep pace with inflation and avoid a loss of real buying power,

2  adjustment rates must be at least as large as the CPI's increase.

3      38.    City staff, however, typically prepares a report that includes adjusting

4  at less than the full rate of inflation (typically 75% and 50% of CPI).  There is no

5  principled, rational, or reasoned basis for the City's selection of 75% and 50% of

6  CPI as the inflation adjustment rates to include in staff reports, nor for the selection

7  by the Board of one inflation adjustment rate over another.  Indeed, the City

8  irrationally, arbitrarily, and capriciously selects the inflation adjustment rate based

9  on *ad hoc* political considerations without regard to what is needed to ensure a fair

10  rate of return and preserve reasonable, investment-backed expectations.

11      39.    Using inflation adjustment rates that do not account for the full rate of

12  inflation is confiscatory and erodes the value of a park owner's investment in real

13  dollars.

14      40.    Since the imposition of rent control, the City has also changed the

15  stated purpose of its Rent Control Scheme.  The stated purpose of the 2006

16  Amendments is to assure the supply of affordable housing within the City of Carson.

17  Previously, the stated purpose of the Ordinance had been to combat rapidly

18  increasing mobilehome rents created by a serious shortage of mobilehome rental

19  spaces.

20          2.    Fair Return Rent Increase Applications

21      41.    In addition to the general rent increase application procedure provided

22  by the Ordinance, Section IV of the Guidelines permits park owners to file a rent

23  increase application if a rent increase is necessary because the park cannot earn a

24  "fair return" without an increase greater than that permitted by application of the

25  general rent increase factors in the Ordinance.  Given the unreasonable manner in

26  which the general rent increase factors are calculated and applied, a fair return

27  application is virtually essential.

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

COMPLAINT

42.   The City's fair return analysis is required to serve as a separate, independent check on permissible rents apart from the eleven factors and quantitative methodologies it purports to use to determine general rent increases. This fact was completely ignored by the City leading up to, and throughout, the hearing on Colony Cove's rent increase applications as discussed below.

43.   In enacting Section IV of the Guidelines, the City has merely paid lip service to the fact that local governments must permit landowners to earn a fair return on their investment. *See Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988); *accord Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 165 (1976). The City's Rent Control Scheme does not permit park owners to earn a fair return.

44.   To provide a fair return, local governments must consider landowners' and investors' incentives. In other words, the City must consider incentives for new investors such as Colony Cove to invest in mobilehome parks and to continue to put money into the park to maintain and improve it.

45.   To provide a fair return, local governments must permit landowners to earn a reasonable profit.

46.   To provide a fair return, the rate of return has to be commensurate with returns on investments in other enterprises having corresponding risks. This necessarily means that the rate of return for owning and operating a mobilehome park has to be greater than that of risk-free investments such as treasurys or certificates of deposit ("CD's").

47.   The City's Rent Control Scheme does not do any of these things in practice or effect. Historically, the Board has not even permitted rent increases to keep up with inflation. In fact, the Board has not even permitted Colony Cove rent increases amounting to 50% of inflation. In practice, the City has ignored Section IV of the Guidelines and governing law requiring that park owners be permitted to earn a fair return. The Board has therefore applied the City's Rent Control Scheme

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

COMPLAINT

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000    FAX (310) 394-4700

in an unconstitutional manner resulting in a widespread confiscatory effect on efficient park owners.

### 3.   Illegal Transfer of Value

48.     The Ordinance also contains a rent lock-in provision that provides, "Except as herein provided, a Park Owner shall not demand, accept or retain rent exceeding the rent in effect on June 1, 1983." As a result of this provision and others, the Rent Control Scheme unlawfully transfers the value of mobilehome parks from their owners to their residents.

49.     The most common arrangement at mobilehome parks in the City is that a mobilehome owner owns his or her mobilehome (also called a coach) and rents the space (also called a lot or a pad) that the mobilehome sits on from the park owner. When the owner of a mobilehome decides to move out of his or her coach, typically the coach will remain in place, and the owner will sell it.

50.     Under the Rent Control Scheme, if an existing resident sells his or her coach to a new tenant, the rent level charged to the new tenant may not be adjusted to reflect the market conditions at the time of the sale. Instead, the rents remain fixed for the new owner at the below-market rent being paid by the former owner of the coach. The rent lock-in provision allows selling coach owners to sell the "right" to a below market rent to a purchaser, thereby capturing a "premium" equal to the present value of future rent control.

51.     Although the Rent Control Scheme was purportedly enacted to increase the supply of affordable housing in the City, it has resulted in the opposite. The Rent Control Scheme artificially increases the costs of mobilehomes in the City making them far less affordable to buyers. The Rent Control Scheme has resulted in premium prices for mobilehomes that are subject to regulated rental rates. Purchasers of mobilehomes in the City are forced to pay sellers not only for the fair market value of the physical coach or mobilehome, but also for the valuable right to

1    rent space in the park at rent-controlled rates set in 1983 and increased only

2    marginally since then at rates far below the rate of inflation.

3         52.    New Park tenants have paid the incumbent tenants an inflated up front

4    purchase price for the coach because the seller is capturing the increase in the value

5    of residential property that the City has wrongfully prevented a mobilehome park

6    owner from realizing through the unlawful Rent Control Scheme.

7         53.    Attached as Exhibit A is a chart demonstrating this increased purchase

8    price and premium by showing nearly fifty sales of mobilehomes in Colony Cove

9    during the last two years, which is incorporated herein by this reference.  The chart

10   shows the sales price of each coach, which averages approximately $118,000.  The

11   chart also shows the value of the coach according to the NADA Appraisal Guide

12   and/or "Blue Book," whereby most coaches in the Park on average are worth

13   approximately $33,000.  The chart also shows that the average premium transferred

14   from Colony Cove to its tenant as part of the sale of the physical mobilehome itself

15   is, on average, approximately $85,000.

16        54.    Therefore, the average premium captured by Park residents transferring

17   their home during this period was approximately $85,000 (based on the NADA

18   Appraisal Guide/Blue Book value of the mobilehome unit at the time of sale), which

19   is over 2.5 times the value of the coach.  Based on the Park's 403 spaces, the City's

20   Rent Control Scheme has transferred over $34 million of the Park's value from

21   Colony Cove to its residents.

22        55.    Based on information and belief, the 2006 Amendments (and the

23   Board's actions based thereon at the hearing as discussed below) have increased the

24   amount of this premium transfer.

25        56.    Moreover, the Rent Control Scheme has not in any way combated the

26   perceived high costs of mobilehome ownership in the City or done anything to

27   address the perceived lack of affordable housing in the City.  The cost of buying a

28   mobilehome in the City is far above the fair market value of the mobilehome itself

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

-13-

1  and is completely unregulated by the City, except to the extent that its Rent Control

2  Scheme is the direct cause for why it is excessively expensive to acquire

3  mobilehomes in the City and allows current mobilehome park tenants to extract

4  above-market prices for their coaches when they elect to sell.

5      57.    The cost of housing in the City has increased dramatically over the last

6  several years.  Unlike other landowners and developers, however, Colony Cove has

7  not been able to enjoy increased rents during this period because of the severe

8  restrictions on rent contained in the Rent Control Scheme.  While the Park tenants

9  capture a premium on the sale of their mobilehome units, the Rent Control Scheme

10 prevents Colony Cove from even coming close to charging tenants fair market rent

11 (or even allowing net operating income to keep pace with inflation).  In 2006 and

12 2007, Colony Cove charged Park residents an average of approximately $400 per

13 month for rent.  The fair market rent during the same time frame, however, would

14 have well exceeded, and currently exceeds, $800 per month.

15      58.    No legitimate governmental purpose is advanced by this transfer of the

16 value of Colony Cove's property to the current Park residents.  The supply of

17 affordable mobilehomes or housing the City is not increased as a result of the Rent

18 Control Scheme.  Instead, the Rent Control Scheme merely transfers the value of

19 Colony Cove's property to the private coach owners.

20  **B.    Colony Cove Purchases the Park with the Expectation that Its Debt Service Would Be Included as an Expense.**

21

22      59.    On or about April 4, 2006, Colony Cove purchased the Park for

23 approximately $23,050,000.  The purchase price that Colony Cove paid represented

24 a fair market value of the Park and was commercially reasonable.  In fact, the seller

25 of Colony Cove had listed the Park for sale at a price exceeding $28 million and

26 received other offers that were around the same price as the $23,050,000 purchase

27 price that Colony Cove paid.

28

COMPLAINT

60.   Colony Cove's purchase included a down payment of $5,050,000, which represents Colony Cove's initial equity investment in the Park.

61.   The remaining approximately $18 million was financed using common and commercially reasonable financing terms, including but not limited to the interest rate and the loan-to-value ratio.

62.   Accordingly, using prudent and customary financing procedures, Colony Cove's purchase of the Park requires debt service payments (i.e., interest payments) exceeding $1.3 million per year.

63.   At the time Colony Cove purchased the Park in April 2006, the City's rent control law provided for a gross profit maintenance (sometimes referred to as "GPM") methodology for calculating rent increases.  Under the City's Rent Control Scheme as it existed at the time Colony Cove purchased the Park in April 2006, Colony Cove was entitled to, and reasonably expected to, have its debt service expenses included as an allowable operating expense.

64.   As discussed above, the City's 2006 Amendments to the Rent Control Scheme constituted a substantial reworking of City's rent control law and caused a reduction in the value of the Park because, among other things, it displaced the gross profit maintenance methodology for determining rent adjustments with a flawed and artificial maintenance of net operating income methodology for calculating rent increases.  This flawed maintenance of net operating income analysis the City adopted does not consider a park owner's debt service expenses, which are commercially reasonable and often substantial.  Because this omission of proper expenses works a sizeable economic advantage to the politically powerful mobilehome park residents, the City has in practice all but abandoned the gross profit maintenance methodology (which as discussed below mandated that Colony Cove receive a rent increase of over $200).

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

C.   **Colony Cove's General Rent Increase Application filed in 2006.**

65.   Before Colony Cove's purchase of the Park in April 2006, the prior owner of the Park had applied to the Board for a general rent increase (the "2006 Application") seeking an increase of $163.63 per space.

66.   On or about September 27, 2006, after Colony Cove had acquired the Park, the Board held a public hearing on the 2006 Application.

67.   In Resolution No. 2006-244 dated September 27, 2006, the Board awarded an increase of only $6.23 per space.

68.   Colony Cove filed suit against the City in Los Angeles Superior Court seeking a writ of administrative mandate against the Board.

69.   In ruling in that case, the Superior Court found that the Board had improperly classified $15,526.50 as a capital improvement and that there was no evidence that these expenditures were part of a major rehabilitation of the Park.

70.   On or about April 21, 2008, the Superior Court issued a writ directing the Board to reevaluate an appropriate rent increase in light of the Superior Court's findings that there was no evidentiary basis for the Board's determination.

71.   On August 6, 2008, the Board enacted Resolution No. 2008-257, which merely affirmed its prior determination that the $15,526.50 in dispute was indeed a capital improvement, and the Board merely concluded – again – that these expenditures were part of a major rehabilitation of the Park.

72.   In doing so, the Board acted in direct contravention of the Superior Court's writ finding that there was no evidence that these expenditures were part of a major rehabilitation of the Park.

73.   The Board's lawless conduct and cavalier attitude toward this Order of the Superior Court demonstrates its propensity to do as it pleases without any concern for the rule of law and the futility of the administrative Rent Control

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

COMPLAINT

1    Scheme.  Seeking further relief from the Board, particularly after it has already ruled

2    on a rent increase application, is futile.

3          74.    Colony Cove presently seeks no relief herein for the Board's

4    misconduct as it pertains to the 2006 Application, but sets forth these allegations to

5    demonstrate and underscore the lawless behavior of the Board.  These allegations

6    may become relevant, however, to affirmative defenses that the City may raise.  At

7    the very least, these events demonstrate that the City's tactics effectively deprive

8    Colony Cove of the right to obtain judicial review of the Board's administrative

9    decisions.

10         **D.    Colony Cove's General and Fair Return Rent Increase**
           **Applications filed in 2007.**

11         75.    Under the City's Rent Control Scheme, a park owner does not receive

12   automatic rent increases pursuant to a CPI formula or any other similar self-

13   executing method.  Rather, to receive a rent increase, a park owner must undertake a

14   burdensome and costly application process.

15         76.    Accordingly, on or about September 28, 2007, Colony Cove submitted

16   general and fair return rent increase applications to the City.

17         77.    As discussed above, the first step in the process is for City staff to

18   disallow hundreds of thousands of dollars in operating expenses.  City staff uses no

19   objective methodology in deciding which expenses to disallow.  In this case, City

20   staff unreasonably, arbitrarily, and capriciously disallowed, prorated, or capitalized

21   an unprecedented $889,438 in operating expenses.  The obvious practical effect of

22   this is an outrageous overstatement of a park's profitability.  Indeed, this extreme

23   disallowance translates into each Park resident being credited with paying over $180

24   per month more than he or she actually does ($183.92 = $889,438 / 12 months / 403

25   spaces).

26         78.    Historically, the Board's allowed rent increases have been particularly

27   stingy with respect to Colony Cove, which, as a result, has faced stunted rent growth

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000  •  FAX (310) 394-4700

COMPLAINT

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1   compared with the rise in inflation.  In 1994, the average rent at Colony Cove was

2   $374.52.  In 2005, the average rent was $408.05.  During this eleven-year time span,

3   rents were only permitted to grow by $33.53 (approximately $3 per year).  Thus,

4   Colony Cove rents were allowed to grow only 9% over eleven years, while over the

5   same eleven years, inflation grew 32.5%.

6          79.    According to Carson's municipal code, the public hearing on a rent

7   increase application must be held within sixty days of it being deemed substantially

8   complete and the Board must make a written decision on the application within

9   seventy-five days of the application being deemed substantially complete.

10         80.    Colony Cove's applications were deemed substantially complete on

11   December 11, 2007.  The public hearing on Colony Cove's applications was

12   originally scheduled for February 13, 2008.

13         81.    The public hearing on Colony Cove rent increase applications,

14   however, did not actually take place until June 11, 2008.  The City unilaterally

15   continued the hearing at least twice, including once because the City wanted its

16   putative experts to prepare a further rebuttal to Colony Cove's contentions.

17         82.    In written submissions and through testimony at the hearing, Colony

18   Cove presented evidence that:

19         •  Colony Cove's expenses exceeded its revenue by over $1 million per

20            year;

21         •  From 1994 to 2005, inflation (according to the CPI) had increased over

22            32.5%, while Colony Cove rents had only increased 9%;

23         •  Colony Cove was entitled to a 9% return on its $23,050,000 purchase

24            price or a 11.5% return on its $5,050,000 equity investment;

25         •  At the time Colony Cove purchased the Park, CDs were earning a 5%

26            annual return, but Colony Cove was earning a negative return on its

27            investment in the Park; and

28

-18-

- Various quantitative methodologies performed by various experts all arrived at the same conclusion – a rent increase of approximately $200 per space per month was necessary for Colony Cove to earn a fair return on its investment (even using the City's incorrect view of Colony Cove's expense numbers).

83.   In sharp contrast to the approximately $200 figure presented by Colony Cove (which assumes *arguendo* the City's incorrect view of Colony Cove's expense numbers), City staff prepared a report recommending that the Board grant a $15.65 per space per month rent increase.

84.   Neither City staff nor any putative expert hired by the City performed a fair return analysis despite the fact that Colony Cove repeatedly advised the City that this analysis was required by law.

85.   In fact, there was no basis for the City to rely on any of the opinions of its consultant, Kenneth K. Baar, because he was wholly unqualified to give the opinions he gave.  He is not a real estate appraiser, MBA, or economist, yet his opinions inappropriately ventured squarely into those realms.

86.   The Board did not issue its final decision on Colony Cove's rent increase application until August 6, 2008 – almost one full year after the rent increase applications were filed.  The Board's delay in holding the public hearing and issuing its decision on Colony Cove's rent increase application was not consented or agreed to by Colony Cove, was not due to the conduct of Colony Cove, nor was it due to some cause beyond the Board's control.

87.   Despite the evidence that Colony Cove was operating at a loss of over $1 million per year (or nearly $200,000 per year according to the City's incorrect view of Colony Cove's expense numbers) and that a rent increase of approximately $200 per space per month was necessary for Colony Cove to earn a fair return (based on those same numbers), the Board only approved a $36.74 per space rent

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

COMPLAINT

1    increase.  A copy of Resolution No. 2008-256 awarding a $36.74 increase is

2    attached as Exhibit B.

3        88.    Even with this rent increase, Colony Cove will still operate at a loss,

4    even according to the City's incorrect view of Colony Cove's expense numbers.

5    This meager increase does not permit a fair return to Colony Cove.  It means that

6    Colony Cove will continue to operate at a loss, when in fact it is unconstitutional

7    and unlawful for the City to restrict the rents charges at the Park to levels that are so

8    low as to prevent Colony Cove from earning a fair profit on its investment.

9        89.    The City's final decision awarding a $36.74 per month increase is

10   irrational, arbitrary, capricious, and wholly unjustified based on the record leading

11   up to the decision.

12       90.    It has also taken nearly a year from the time that Colony Cove filed its

13   rent increase applications until the City issued its final decision on those

14   applications.  Under state law, however, the meager rent increase approved by the

15   City in August cannot take effect as a practical matter until December 1, 2008 –

16   nearly four months after the Board's final decision.  All told, therefore, the City's

17   procedures have delayed Colony Cove's rent increase for over a year and failed to

18   provide Colony Cove with a rent increase that will permit it to earn a fair return on

19   its investment.

20                            **FIRST CLAIM FOR RELIEF**

21       **(Violation of the Due Process Clause of the Fourteenth Amendment
         Under 42 U.S.C. § 1983 – Facial Substantive Due Process Claim)**

22       91.    Colony Cove repeats and realleges each and every allegation contained

23   in paragraphs 1 to 90, and incorporates them herein by reference.

24       92.    Governmental conduct may be so arbitrary and irrational as to violate

25   due process rights.  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005)

26   (Kennedy, J., concurring); *Crown Point Development v. City of Sun Valley*, 506 F.3d

27   851, 856 (9th Cir. 2007).  "The failure of a regulation to accomplish a stated or

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

COMPLAINT

1   obvious objective" may constitute a substantive due process violation. *Lingle*, 544

2   U.S. at 548 (Kennedy, J., concurring).

3        93.    The Rent Control Scheme is the quintessential example of a regulation

4   that utterly fails to advance any legitimate governmental interest. To the contrary, it

5   is an empirical and economic certainty – an established fact well beyond cavil – that

6   the Rent Control Scheme imposes a singular and severe burden on a single, very

7   small class of landowners, to benefit a select group of private individuals, merely

8   because they fortuitously resided at this Park when the Rent Control Scheme was

9   enacted.

10        94.    In enacting the Rent Control Scheme, the City has acted irrationally,

11   arbitrarily, and capriciously. The Rent Control Scheme on its face fails to advance

12   any legitimate governmental interest.

13        95.    In fact, the Rent Control Scheme works contrary to its stated purpose of

14   increasing affordable housing.

15        96.    With the rents having been frozen by the Rent Control Scheme,

16   mobilehome buyers in the City are forced to pay a substantial premium for the

17   severely limited rent adjustments. When an existing resident sells his or her coach

18   to a new resident, the rent level charged to the new resident may not be adjusted to

19   reflect market conditions at the time of the sale. This rent lock-in provision, coupled

20   with the unreasonably low rent adjustment procedures in the Rent Control Scheme,

21   permits selling coach owners to sell the "right" to a below market rent to a coach

22   purchaser, and to capture a "premium" equal to the discounted present value of

23   future rent control. In fact, this is exactly what has happened in the Park as a

24   historical and empirical fact.

25        97.    This premium results in a transfer of the value of the land from Colony

26   Cove, the true owner, to the residents of the Park. As a consequence, the price of

27   housing remains unchanged and the Rent Control Scheme's stated purpose of

28   preserving affordable housing in the City is not advanced. And since the rent

COMPLAINT

1   Control Scheme does not purport to regulate the prices at which tenants can sell

2   their coaches and the mark-ups they can demand, the Rent Control Scheme leaves

3   the key affordability variable – the price of mobilehomes – completely unregulated

4   while creating tremendous economic opportunities for sellers to charge prices far

5   above the fair market value of the mobilehome structure being sold.

6        98.    The resale prices for mobilehomes in the Park are greatly inflated and

7   have no relationship to their actual retail value.

8        99.    On its face, the Rent Control Scheme fails to substantially advance its

9   stated goal, or any legitimate government purpose.  The Rent Control Scheme does

10   not substantially advance its stated goal of promoting affordable housing.  To the

11   contrary, it has the empirical and economic effect of artificially inflating the prices

12   of mobilehomes in the City.

13        100.  The Rent Control Scheme takes the private property of one party for

14   the primary purpose of transferring it to another private party without advancing a

15   legitimate government purpose.  The private wealth transfer achieved by enactment

16   of the Rent Control Scheme does not constitute a legitimate public interest.

17        101.  The Rent Control Scheme is also arbitrary and irrational because the

18   City does not check or otherwise verify the income or net worth of any individual

19   mobilehome park resident to determine whether a below market rent for that

20   individual is an economic necessity.

21        102.  The City's conduct constitutes action under color of law, or state

22   action, undertaken pursuant to a City policy, practice, or custom of deliberate

23   indifference to Colony Cove's rights in violation of the Fourteenth Amendment of

24   the United States Constitution and in violation of 42 U.S.C. § 1983.

25        103.  Colony Cove has no speedy or adequate remedy at law or otherwise to

26   prevent the irreparable harm the City is causing through its unlawful enforcement of

27   its Rent Control Scheme.  Colony Cove has also been hampered in, and will be

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000   FAX (310) 394-4700

COMPLAINT

1  prevented from, properly and adequately carrying on its business unless the City is

2  restrained and enjoined from wrongfully enforcing its Rent Control Scheme.

3      104.   Colony Cove has incurred and will continue to incur attorneys' fees and

4  costs because of this proceeding in amounts that cannot yet be fully ascertained.

5  These amounts are recoverable under 42 U.S.C. §§ 1983 and 1988.

## SECOND CLAIM FOR RELIEF

### (Violation of the Due Process Clause of the Fourteenth Amendment Under 42 U.S.C. § 1983 – As-Applied Substantive Due Process Claim)

8      105.   Colony Cove repeats and realleges each and every allegation contained

9  in paragraphs 1 to 104, and incorporates them herein by reference.

10     106.   As set forth above, the City has failed to award Colony Cove rent

11  increases that were warranted based on the record and has failed to permit Colony

12  Cove to charge rents tat the Park that will cover its costs and permit it to earn a fair

13  rate of return.

14     107.   In doing so, the City has acted irrationally, arbitrarily, and capriciously

15  and has violated Colony Cove's substantive due process rights.  Among other

16  things, the City performed no fair return analysis even though Colony Cove

17  repeatedly advised the City that it was required to perform one under governing law.

18  Indeed, the City continued the public hearing on Colony Cove's general and fair

19  return rent increase applications so that the City's putative expert could perform a

20  fair return analysis.  The City's putative expert, however, still did not perform a fair

21  return analysis.

22     108.   The City's conduct constitutes action under color of law, or state

23  action, undertaken pursuant to a City policy, practice, or custom of deliberate

24  indifference to Colony Cove's rights in violation of the Fourteenth Amendment of

25  the United States Constitution and in violation of 42 U.S.C. § 1983.

26     109.   As a result of the City's violation of Colony Cove's substantive due

27  process rights, Colony has suffered damages in an amount to be proven at trial.

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000   FAX (310) 394-4700

COMPLAINT

110.   Colony Cove has no speedy or adequate remedy at law or otherwise to prevent the irreparable harm the City is causing through its unlawful enforcement of its Rent Control Scheme. Colony Cove has also been hampered in, and will be prevented from, properly and adequately carrying on its business unless the City is restrained and enjoined from wrongfully enforcing its Rent Control Scheme. Colony Cove has incurred and will continue to incur attorneys' fees and costs because of this proceeding in amounts that cannot yet be fully ascertained. These amounts are recoverable under 42 U.S.C. §§ 1983 and 1988.

## THIRD CLAIM FOR RELIEF

### (Violation of the Takings Clause of the Fifth Amendment Under 42 U.S.C. § 1983 – Facial Taking)

111.   Colony Cove repeats and realleges each and every allegation contained in paragraphs 1 to 110, and incorporates them herein by reference.

112.   Colony Cove's Third Claim for Relief is based on the City's enactment of the Rent Control Scheme, which prevents Colony Cove from increasing rents to obtain a fair return in violation of the Takings Clause of the Fifth Amendment of the United States Constitution.

113.   The United States Supreme Court has recognized that the fundamental purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). "[W]hile property may be regulated to a certain extent, if the regulation goes too far, it will be recognized as a taking." *Lingle*, 544 U.S. at 537 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) (Holmes, J.)).

114.   The Supreme Court in *Yee* stated that once a plaintiff raises a takings claim, it may proceed under any and all theories that support that claim:

> Petitioners' arguments that the [rent control] ordinance constitutes a taking in two different ways, by physical

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

-24-

COMPLAINT

occupation and by regulation, are not separate claims. They are, rather, separate arguments in support of a single claim – that the ordinance effects an unconstitutional taking.

*Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992).

A.  **The Rent Control Scheme Effects a Regulatory Taking under** *Penn Central*.

115.  The Supreme Court in *Lingle*, 544 U.S. at 538, recognized that a takings claim may be brought under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

116.  The Rent Control Scheme effects a facial and as-applied taking of Colony Cove's property under the standard set forth in *Penn Central*.  *See Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*, 311 F. Supp. 2d 972, 993-94 (D. Nev. 2004) (recognizing a facial *Penn Central* takings claim).

117.  Although there is no "set formula" for evaluating a regulatory takings claim under *Penn Central*, the Supreme Court has identified "several factors that have particular significance":

Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.  In addition, the 'character of the governmental action' – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good' – may be relevant in discerning whether a taking has occurred.

*Lingle*, 544 U.S. at 538-39 (quoting *Penn Central*, 438 U.S. at 124).

118.  Additional factors to be considered in evaluating a *Penn Central* takings claim are (1) whether the regulation is "reasonably necessary to the effectuation of a substantial public purpose," *Penn Central*, 438 U.S. at 127, (2) the allocation of the burden among all taxpayers and whether a landowner has been

COMPLAINT

1   "singled out," *Lingle*, 544 U.S. at 543; *Penn Central*, 438 U.S. at 127 (considering

2   whether the regulation "has an unduly harsh impact upon the owner's use of the

3   property"); and (3) whether the effect of the regulation is functionally similar to a

4   physical taking. *Lingle*, 544 U.S. at 539.

5        1.   <u>Economic Impact</u>

6        119.   Without the City's Rent Control Scheme, the Park would be worth

7   approximately $55 million.  As of April 2006, the Park's value with part of the Rent

8   Control Scheme in place was approximately $23 million.  Thus, the Rent Control

9   Scheme has caused Colony Cove to suffer a permanent economic loss of

10   approximately $32 million.  This is consistent with the allegations above, namely

11   that the City's Rent Control Scheme has transferred approximately $34 million of

12   the Park's value from Colony Cove to its residents.

13        120.   The Rent Control Scheme therefore deprives Colony Cove of

14   approximately 60% or more of the value of its land and continues to deprive Colony

15   Cove of approximately 70% of its net operating income. *See Keystone Bituminous*

16   *Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) ("[O]ur test for regulatory

17   takings requires us to compare the value that has been taken from the property with

18   the value that remains in the property.").

19        121.   The Rent Control Scheme also creates an exponentially expanding gap

20   between the permitted rental income for the land and fair market rent for the land,

21   by, among other things, using an improper base year for its maintenance of net

22   operating income analysis, rejecting rent increases that would permit a fair return,

23   and allowing adjustment of rents at less than the full rate of inflation (i.e., less than

24   100% of CPI).

25        122.   Additionally, the economic impact is immediate and permanent.  Once

26   the Rent Control Scheme was fully enacted, the Park immediately lost the present

27   value of all the lost future rental income in perpetuity.

28

COMPLAINT

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

123.   The Rent Control Scheme also imposes a severe economic burden on Colony Cove by denying Colony Cove its fundamental right to exclude other persons from its property. *Lingle*, 544 U.S. at 539 ("[T]he owner's right to exclude others from entering and using her property [is] perhaps the most fundamental of all property interests."); *see also Yee*, 503 U.S. at 531 n.* ("[B]efore the adoption of the [rent control] ordinance [the park owners] were able to influence a mobile home owner's selection of a purchaser by threatening to increase the rent for prospective purchasers they disfavored.").

124.   Under California's Mobilehome Residency Law (also known as the "MRL"), Colony Cove must rent to a tenant in perpetuity. *Yee*, 503 U.S. at 524. And under the Rent Control Scheme, residents have the right to live at the Park indefinitely at a submarket rent, and they can effectively control whether and to whom to sell the in-place location and Colony Cove has no means to determine, or even influence, who may live on its land.

125.   This is "one factor a reviewing court would wish to consider in determining whether the ordinance unjustly imposes a burden … that should be 'compensated by the government, rather than remain[ing] disproportionately concentrated on a few persons.'" *Yee*, 503 U.S. at 531 (quoting *Penn Central*, 438 U.S. at 124).

2.   Interference with investment-backed expectations

126.   Colony Cove is a limited liability company that necessarily has legitimate investment-backed expectations to earn a fair market rental value from its investments.

127.   As the Supreme Court recognized in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), market expectations are based upon fair market values, not historical cost or the value of a property under regulation. *Palazzolo*, 533 U.S. at 625 (confirming that "[w]hen a taking has occurred…the owner's damages will be

COMPLAINT

1  based upon the property's fair market value…" (citing *Olson v. United States*, 292

2  U.S. 246, 255 (1934)).

3      128.  The "lack of a personal financial investment by a postenactment

4  acquirer of property" does not defeat a *Penn Central* takings claim.  *Palazzolo*, 533

5  U.S. at 635 (O'Connor, J., concurring).  "[T]he 'investment backed expectations'

6  that the law will take into account do not include the assumed validity of a

7  restriction that in fact deprives the property of so much of its value as to be

8  unconstitutional." *Id.* at 637 (Scalia, J., concurring).

9      129.  Colony Cove has a reasonable expectation that it will receive a rate of

10  return commensurate with a reasonable rate of return on its investment.

11      130.  Additionally, the 2006 Amendments to the Rent Control Scheme

12  resulted in a further substantial interference with legitimate investment-backed

13  expectations and reduced the value of the Park by changing the predominant

14  quantitative analysis for general rent increases from a gross profit maintenance

15  formula to a maintenance of net operating income formula.  Under the City's Rent

16  Control Scheme as it existed at the time Colony Cove purchased the Park in April

17  2006 (i.e., under a gross profit maintenance based system), Colony Cove's debt

18  service expenses were to be considered as proper expenses in rent increase

19  calculations.  The City's new flawed and artificial maintenance of net operating

20  formula does not consider debt service in any expense calculations.  As a result,

21  Colony Cove's debt service expenses were improperly excluded by the City when

22  setting rents even though debt service payments are commercially reasonable and

23  accepted expenses for almost every property owner.

24        3.  Burden on Colony Cove

25      131.  The Court in *Lingle* emphasized the importance of determining whether

26  the economic burden of a regulation is fairly spread among taxpayers, or whether a

27  particular land owner has been "singled out" to bear the regulatory burden.  *Lingle*,

28

COMPLAINT

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1  544 U.S. at 543; *see also Penn Central*, 438 U.S. at 132 (recognizing that a law that

2  "singled out" a specific parcel for regulation is likely to constitute a taking).

3      132.  Colony Cove has been singled out because mobilehome housing is the

4  only form of housing in the City for which rents or prices are controlled by the

5  government.  Thus, the economic burden of the City's rent control law has been

6  imposed almost exclusively on a single class of landowners.

7          4.  <u>Reasonable relationship with a public purpose</u>

8      133.  Post *Lingle*, it is unclear the extent to which a law reasonably

9  promoting a public purpose remains a proper factor for consideration in determining

10  whether that law effects an unconstitutional taking under *Penn Central*.  *Penn*

11  *Central*, 438 U.S. at 127 (a use restriction may be a taking "if not reasonably

12  necessary" for a public purpose).

13      134.  Nevertheless, as alleged above in Colony Cove's facial substantive due

14  process claim, the City's Rent Control Scheme bears no reasonable relationship to

15  any legitimate public purpose.  Historically and empirically, the rent Control

16  Scheme serves only to create artificially high prices for mobilehomes in the City and

17  to general a private wealth transfer.

18          5.  <u>Whether the Ordinance is "functionally equivalent" to a physical</u>
   <u>taking</u>

19

20      135.  In determining whether a regulatory taking has occurred, the extent to

21  which the regulatory actions are "functionally equivalent" to a physical taking is

22  another relevant inquiry.  *Lingle*, 544 U.S. at 539.  The Court noted that a physical

23  taking may impose minimal economic costs, but is *per se* a taking requiring

24  payment of just compensation because it "eviscerates the owner's right to exclude

25  others from entering and using her property."  *Lingle*, 544 U.S. at 539.

26      136.  Because the Rent Control Scheme has precisely that effect, *i.e.*, it

27  denies Colony Cove the right to exclude others from its property, it is, at a

28  minimum, functionally equivalent to a physical taking.  *Yee*, 503 U.S. at 528

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

1   (although mobilehome rent control is not *per se* a physical taking, "[a] different case

2   would be presented were the statute, on its face or as applied, to compel a landowner

3   over objection to rent his property or to refrain in perpetuity from terminating a

4   tenancy").

**B.    The Unconstitutional Rent Control Scheme Effects a Physical Taking.**

5

6

7       137.   Under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419

8   (1982), and *Yee*, the City's enactment of the Rent Control Scheme has constituted a

9   physical taking of Colony Cove's property as a matter of law because, unlike the

10  park owner in *Yee*, Colony Cove is precluded from converting the Park to another

11  use by the City's political commitment to maintaining the Park as a mobilehome

12  park and ordinances aimed at ensuring the Park remains a rental mobilehome park.

13      138.   For example, Colony Cove is effectively prohibited from subdividing

14  the Park (i.e., converting the Park to condominium-style resident ownership).  The

15  City has already recently denied the tentative tract map application (which would

16  allow subdivision) of Carson Harbor Village, another luxury mobilehome park in

17  the City.  On information and belief, the City has provided a commitment to Park

18  residents that it will oppose any such a change of use or change in ownership

19  structure by Colony Cove.

20      139.   The City already has passed ordinances that make it virtually

21  impossible to subdivide a park to sell the spaces to the residents as permitted by

22  Section 66427.5 of the California Government Code.  *See generally* Carson

23  Municipal Code §§ 9209.1-9209.6.  The City has also imposed a moratorium on

24  mobilehome park conversions to resident ownership, which the City has extended

25  twice, and the moratorium remains in effect.

26      140.   City law also contains an ordinance designed to prevent the conversion

27  of the Park to another use.  *See generally* Carson Municipal Code § 9128.21.  The

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

COMPLAINT

1   practical and economic impact of this ordinance and other governing law is that any

2   conversion to another use is economically infeasible.

3        **C.**    **The Ordinance Effects a "Private Taking" Under *Kelo* and**

4               ***Armendariz.***

5       141.   "[I]f a government action is found to be impermissible – for instance

6   because it fails to meet the 'public use' requirement, or [is] so arbitrary as to violate

7   due process – that is the end of the inquiry.  No amount of compensation can

8   authorize such action." *Lingle*, 544 U.S. at 543.

9       142.   To meet the public use requirement, legislation that interferes with

10   property rights must serve a public purpose, as opposed to benefiting private

11   individuals.  As the Supreme Court stated in *Hawaii Housing Authority v. Midkiff*,

12   467 U.S. 229 (1984), "the Court's cases have repeatedly stated that 'one person's

13   property may not be taken for the benefit of another private person, without a

14   justifying public purpose, even though compensation be paid." *Id.* at 241 (quoting

15   *Thompson v. Consolidated Gas Corp.*, 300 U.S. 55, 80 (1937)).  "[A] purely private

16   taking could not withstand the scrutiny of the public use requirement." *Id.* at 245;

17   *Kelo v. City of New London*, 545 U.S. 469, 477 (2005).

18       143.   Prior to *Lingle*, the Ninth Circuit, sitting *en banc* in *Armendariz v.*

19   *Penman*, 75 F.3d 1311, 1320-21 (9th Cir. 1996), found a private taking where the

20   effect of the government's conduct was to compel one landowner to sell its land at

21   distressed prices to another private party.[1]

22       144.   The clear purpose and effect of the Rent Control Scheme was to confer

23   a favor on a discrete number of private individuals who resided in the Park.

24       145.   The City enacted and maintains the Rent Control Scheme in the face of

25   compelling empirical proof that it has caused mobilehome housing prices to increase

26   and served no public benefit, but instead serves purely to confer a private benefit.

27       [1] *Armendariz* has been overruled on other grounds by *Crown Point*

28   *Development v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007).

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000   FAX (310) 394-4700

1    There is no public benefit from the Rent Control Scheme, and the City's contrary

2    assertions are pretextual, baseless, and irrational.

3        **D.    Each of Colony Cove's Takings Theories is Ripe.**

4        146.   The Supreme Court held in *Willamson County Regional Planning*

5    *Commission v. Hamilton Bank*, 473 U.S. 172 (1985), that a takings claim

6    challenging a land regulation is ripe when the plaintiff has received a final decision

7    on the law's application to its property, and that in certain circumstances, the

8    landowner must seek compensation under state law unless doing so would be futile.

9        147.   The Supreme Court has referred to the *Williamson County* ripeness

10   requirements as "prudential hurdles," not jurisdictional requirements. *Suitum v.*

11   *Tahoe Reg. Planning Agency,* 520 U.S. 725, 735 (1997); *San Remo Hotel, L.P. v.*

12   *City & County of San Francisco*, 545 U.S. 323, 349 (2005) (Rehnquist, C.J.,

13   concurring).

14       148.   Colony Cove's facial takings claim under *Penn Central* and other

15   standards is immediately ripe because it challenges the mere enactment of the Rent

16   Control Scheme. *Yee*, 503 U.S. at 534, *San Remo*, 545 U.S. at 341, ("Petitioners'

17   facial challenges to the HCO were ripe, of course, under *Yee*."); *Lingle*, 544 U.S. at

18   545 ([O]ur holding today – that the 'substantially advances' formula is not a valid

19   takings test – does not require us to disturb any of our prior holdings.")

20       149.   Under Ninth Circuit precedent, the *Williamson County* "final decision"

21   requirement does not apply to facial takings claims. *Ventura Mobilehome*

22   *Communities Owners Ass'n v. City of San Buenaventura*, 371 F.3d 1046, 1052 (9th

23   Cir. 2004) ("[T]he 'final decision' requirement does not apply to facial takings

24   claims because they, by definition, derive from the ordinance's enactment, not any

25   implementing action on the part of governmental authorities.").

26       150.   Nor does the *Williamson County* "final decision" requirement apply to

27   a physical takings claim.

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000   FAX (310) 394-4700

-32-

COMPLAINT

151.  Nevertheless, Colony Cove has received a "final decision" on the application of the Rent Control Scheme by virtue of the City's decisions to enforce it as set forth herein.

152.  Because a private taking cannot be constitutional even if compensated, a plaintiff alleging such a taking does not need to seek compensation in state proceedings before filing a federal takings claim under *Williamson County*. *Armendariz v. Penman*, 75 F.3d 1311, 1325 n.5 (9th Cir. 1996).

153.  Furthermore, pursuit of a state law remedy would be futile in this case because there was no constitutionally adequate discretionary rent increase process during the relevant period. *Williamson County*, 473 at U.S. at 197 (plaintiff not required to pursue state law remedy where state procedure is "unavailable or inadequate").

154.  The City's conduct constitutes action under color of law, or state action, undertaken pursuant to a City policy, practice, or custom of deliberate indifference to Colony Cove's rights in violation of the Fifth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

155.  Colony Cove has no speedy or adequate remedy at law or otherwise to prevent the irreparable harm the City is causing through its unlawful enforcement of its Rent Control Scheme. Colony Cove has also been hampered in, and will be prevented from, properly and adequately carrying on its business unless the City is restrained and enjoined from wrongfully enforcing its Rent Control Scheme.

156.  Colony Cove has incurred and will continue to incur attorneys' fees and costs because of this proceeding in amounts that cannot yet be fully ascertained. These amounts are recoverable under 42 U.S.C. §§ 1983 and 1988.

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

## FOURTH CLAIM FOR RELIEF

### (Violation of the Takings Clause of the Fifth Amendment Under 42 U.S.C. § 1983 – As-Applied Takings Claim)

157.   Colony Cove repeats and realleges each and every allegation contained in paragraphs 1 to 156, and incorporates them herein by reference.

158.   A local government – like the City of Carson here – setting rents so confiscatory so as to not permit property owners to earn a fair return commits an unconstitutional taking of the property.

159.   As set forth above, the City has applied its Rent Control Scheme in an unconstitutional and confiscatory manner by, among other things, not allowing rent increases that would allow Colony Cove to earn a fair return.

160.   Colony Cove's as-applied takings claim is ripe for review by this Court.  The only alternative to the City's procedures is a future rent increase or a "*Kavanau* adjustment" (named after the California Supreme Court case *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal. 4th 761 (1997)).  A *Kavanau* adjustment is a prospective rent increase that (in theory) is supposed to enable a park owner to recoup lost rents – from future tenants – sufficient to provide a fair return.

161.   To seek a *Kavanau* adjustment, a landowner must first petition for a rent increase before an administrative agency.  If unsuccessful, the landowner may seek review in state court through a writ of administrative mandamus.  Then, if the state courts agree that the administrative agency abused its discretion, the landowner must return to the original administrative agency and file another petition requesting the agency to remedy its prior decision.  The entire process is likely to take years.  In the meantime, landowners such as Colony Cove have no way to recoup any losses stemming from the difference between the rents to which they are entitled and those being collected during the entire time that this lengthy process takes place.

162.   As such, the *Kavanau* adjustment is a constitutionally inadequate state remedy that fails to provide a fair return.  *See Carson Harbor Village, Ltd. v. City of*

COMPLAINT

1  *Carson*, 353 F.3d 824, 830 (9th Cir. 2004) (O'Scannlain, J., concurring) (noting

2  "serious concerns about the adequacy of the ... compensation procedures

3  established in *Kavanau*.").

4      163.  To the extent that Park residents paying the higher *Kavanau* rents have

5  not received the benefit of the impermissibly low rents caused by the Rent Control

6  Scheme, the residents are forced to pay just compensation that the City is

7  constitutionally required to pay.  *See Carson Harbor Village, Ltd.*, 353 F.3d at 831

8  (O'Scannlain, J., concurring).

9      164.  Based on information and belief, the Park's residents will not be able to

10  afford the *Kavanau* adjustment in addition to the proper increased rents.  Moreover,

11  Colony Cove will be forced to try to locate and collect past rent from former

12  residents or attempt to collect increased rent from a new tenant who did not receive

13  the benefit of an unconstitutionally low rent.

14      165.  The *Kavanau* adjustment is an elusive, burdensome, and unavailing

15  remedy that effectively deprives property owners in the state of any remedy at all for

16  the arbitrary, irrational, and whimsical conduct of rent control boards.

17      166.  Based on information and belief, in the over ten years since the

18  California Supreme Court decided *Kavanau*, only one property owner in the state

19  has ever received a *Kavanau* adjustment, and that was only after ten years of costly

20  and time-consuming litigation.

21      167.  Based on information and belief, the City has never granted a *Kavanau*

22  adjustment to any property owner.

23      168.  Even if Colony Cove is successful, the process and delay is so

24  burdensome and unavailing that a *Kavanau* adjustment affords no remedy at all.

25  Indeed, the *Kavanau* adjustment "remedy" would remand Colony Cove to the very

26  administrative body – the Board – that has already made its adverse decision in this

27  case and shown recalcitrance with respect to court orders in other cases.

28

COMPLAINT

169.   In addition, Colony Cove has filed an application for a tentative tract map with the City, which will permit Colony Cove to convert the Park from a rental park, to a resident-owned, condominium-style park.  Colony Cove intends to convert the Park as soon as approval is obtained from the City.  A future rent increase in the form of a *Kavanau* adjustment will therefore not be possible to fully compensate Colony Cove, and Colony Cove will be permanently deprived of rents it should have been permitted to collect all along.

170.   Accordingly, any state-court, just-compensation procedure is entirely futile.

171.   To satisfy *Williamson County*'s ripeness requirement, the *Kavanau* adjustment must serve as a "reasonable, certain and adequate provision for obtaining compensation." *Williamson County*, 473 U.S. at 194.  The *Kavanau* adjustment does not meet this standard and therefore does not pass muster under *Williamson County*.

172.   The City's conduct constitutes action under color of law, or state action, undertaken pursuant to a City policy, practice, or custom of deliberate indifference to Colony Cove's rights in violation of the Fifth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

173.   As a result of the City's unlawful taking of Colony Cove's property, Colony Cove has suffered damages in an amount to be proven at trial.

174.   Colony Cove has no speedy or adequate remedy at law or otherwise to prevent the irreparable harm the City is causing through its unlawful enforcement of its Rent Control Scheme.  Colony Cove has also been hampered in, and will be prevented from, properly and adequately carrying on its business unless the City is restrained and enjoined from wrongfully enforcing its Rent Control Scheme.

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

COMPLAINT

175.   Colony Cove has incurred and will continue to incur attorneys' fees and costs because of this proceeding in amounts that cannot yet be fully ascertained. These amounts are recoverable under 42 U.S.C. §§ 1983 and 1988.

## FIFTH CLAIM FOR RELIEF

### (Violation of the Equal Protection Clause of the Fourteenth Amendment Under 42 U.S.C. § 1983 – Facial Equal Protection Claim)

176.   Colony Cove repeats and realleges each and every allegation contained in paragraphs 1 to 175, and incorporates them herein by reference.

177.   Mobilehome parks in the City are the only properties subject to the City's Rent Control Scheme.  No other rental property types (e.g., apartments, houses, and condominiums) in the City face any rent control measures.

178.   This varying treatment of mobilehome park owners is so unrelated to the achievement of any combination of legitimate purposes that one can only conclude that the City's actions were irrational.

179.   The City's conduct constitutes action under color of law, or state action, undertaken pursuant to a City policy, practice, or custom of deliberate indifference to Colony Cove's rights in violation of the Fifth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

180.   Colony Cove has no speedy or adequate remedy at law or otherwise to prevent the irreparable harm the City is causing through its unlawful enforcement of its Rent Control Scheme.  Colony Cove has also been hampered in, and will be prevented from, properly and adequately carrying on its business unless the City is restrained and enjoined from wrongfully enforcing its Rent Control Scheme.

181.   Colony Cove has incurred and will continue to incur attorneys' fees and costs because of this proceeding in amounts that cannot yet be fully ascertained. These amounts are recoverable under 42 U.S.C. §§ 1983 and 1988.

COMPLAINT

## SIXTH CLAIM FOR RELIEF

### (Declaratory Relief)

182.   Colony Cove repeats and realleges each and every allegation contained in paragraphs 1 to 181, and incorporates them herein by reference.

183.   An actual controversy has arisen and now exists between Colony Cove and the City relative to the validity and constitutionality of the City's Rent Control Scheme.

184.   Another actual controversy has arisen and now exists between Colony Cove and the City relative to the proper amount of a rent increase necessary to permit Colony Cove to earn a fair return.

185.   A judicial declaration is necessary and appropriate at this time to settle the parties' disputes concerning the validity and constitutionality of the City's Rent Control Scheme and the rent increase necessary to permit Colony Cove to earn a fair return.

## SEVENTH CLAIM FOR RELIEF

### (Under California Code of Civil Procedure § 1094.5 Seeking Writ of Administrative Mandate)

186.   Colony Cove repeats and realleges each and every allegation contained in paragraphs 1 to 185, and incorporates them herein by reference.

187.   Section 1094.5 of the California Code of Civil Procedure provides for issuance for a writ of administrative mandate to enable this Court to review and correct final administrative determinations made by the Board.

188.   Under Section 1094.5(b), this Court has the authority to issue a writ to correct the Board's acts that constitute an abuse of discretion.  A decision by the Board constitutes an abuse of discretion if the decision is not supported by the findings or the findings are not supported by the evidence.

COMPLAINT

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

189.   From start to finish, the Board abused its discretion by misinterpreting, misapplying, and otherwise failing to follow the City's Rent Control Scheme and other governing law pertaining to the determination of rent increases.

190.   Upon receipt of Colony Cove's general and fair return rent increase applications, City staff unreasonably, arbitrarily, and capriciously disallowed, prorated, or capitalized an unprecedented $889,438 in operating expenses.

191.   City staff used no objective or principled methodology in deciding which expenses to disallow, prorate, or capitalize.  Rather, City staff excluded expenses without justification or basis.  For example, City staff initially excluded over $228,000 in property taxes that Colony Cove paid and arbitrarily classified some landscaping and maintenance as a capital improvement.  This had the effect of overstating the park owner's net operating income and profit, which in turn minimized the rent increase that City staff recommended to the Board.  This entire exercise is aimed at allowing the absolute minimum rent increase possible – if any – as an effort to appease the politically powerful mobilehome residents in the City.

192.   Even taking into account the City's radical exclusion of Colony Cove's expenses, various quantitative methodologies performed by various experts all arrived at the same conclusion – a rent increase of around $200 per space per month was still necessary for Colony Cove to earn a fair return on its investment.

193.   In fact, the gross profit maintenance analysis performed by City staff called for an increase of $200.93.

194.   Colony Cove submitted a genuine maintenance of operating of income analysis – i.e., one that adjusts pre-rent-control net operating income from 1978 to present dollars to take into account the effect of inflation.  This methodology confirmed that Colony Cove's current net operating income was much lower than it should be and that at least a $208.22 per space, per month increase was necessary for the Rent Control Scheme not to have eroded and confiscated the Park's net operating income in real dollars (i.e., inflation-adjusted dollars).

COMPLAINT

195.   Colony Cove also submitted a fair return study that compared Colony Cove's return on its investment with the return in like real estate investments. This study demonstrated that Colony Cove is entitled to a 9% return on its $23,050,000 purchase price or a 11.5% return on its $5,050,000 equity investment. Even using the City's incorrect view of Colony Cove's expense numbers, the fair return study is consistent with the conclusion that a rent increase of approximately $200 per space, per month was warranted.

196.   Colony Cove's fair return study was the only evidence that properly considered landowners' and investors' incentives (i.e., incentives for new investors such as Colony Cove to invest in mobilehome parks and to continue to put money into the park), that Colony Cove cannot be prevented from earning a reasonable profit, and most importantly, that Colony Cove's rate of return has to be commensurate with returns on investments in other enterprises having corresponding risks.

197.   In fact, Colony Cove repeatedly advised the City that it needed to perform this analysis. At one point, the City seemingly agreed and continued the hearing on Colony Cove's applications to permit its putative expert to perform this analysis. The City's expert, however, never did perform any fair return analysis, and there was no evidence – other than Colony Cove's – comparing Colony Cove's returns with returns on investments in other enterprises having corresponding risks.

198.   In the face of a mountain of evidence supporting an approximately $200 rent increase, City staff recommended a $15.65 increase.

199.   The stated basis for this recommendation was the City's flawed and artificial maintenance of operating income analysis. In this case, that calculation involved taking the Park's net operating income from 2005 and adjusting that net operating income for inflation to determine any rent shortfall. (Although the City's methodology is incorrect and provides a useless result, at least City staff recommended using 100% of the inflation rate to adjust the net operating income.)

COMPLAINT

1  As alleged above, this flawed and artificial maintenance of net operating income

2  approach was not authorized at the time Colony Cove purchased the Park in 2006.

3  The prevailing methodology then was the gross profit maintenance approach, which,

4  again, as performed by City staff called for an increase of $200.93.

5      200.   Not only did the City veer down the wrong analytical path by failing to

6  adequately consider whether Colony Cove was earning a fair return and using a

7  bogus rent calculation methodology, the City made mistakes and acted arbitrarily

8  even in pursuing that incorrect path.

9      201.   At the hearing, City staff and its consultants conceded that they had

10  erroneously excluded well over $100,000 worth of Colony Cove's property tax

11  expenses. Based on City staff's methodology (using 100% of the inflation rate to

12  adjust net operating income), this would have increased staff's recommendation to

13  over $40 per space, per month (still using the City's flawed and artificial

14  maintenance of net operating income methodology).  Including these erroneously

15  excluded property taxes would also have increased the rent increase called for by the

16  gross profit maintenance approach to over $220 per space, per month.

17      202.   The Board, however, only awarded a $36.74 per space, per month rent

18  increase based on using only 75% of the inflation adjustment rate (rather than 100%

19  as had been recommended by City staff).

20      203.   This underscores that the Board's selection of an inflation adjustment

21  rate is arbitrary and result-driven.  At the hearing, a Board member moved to grant a

22  rent increase based on an approach using 100% of the rate of inflation, then

23  amended her own motion shortly thereafter – without any discussion or analysis of

24  what might constitute an appropriate rate – to provide for the inflation adjustment at

25  75% of the rate of inflation as if she were picking numbers out of a hat.

26      204.   The Board also refused to permit Colony Cove to cross-examine Park

27  residents and the City's putative experts.  State courts have held that, in a rent

28  control administrative hearing, a rent control board cannot prevent a property owner

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 · FAX (310) 394-4700

COMPLAINT

1  from cross-examining its adversaries and then make findings against the property
2  owner based on that testimony. *See Manufactured Home Communities, Inc. v.*
3  *County of San Louis Obispo*, 2d Civ. No. B196426, slip op. at 6 (Cal. Ct. App. Oct.
4  15, 2008). Doing so violates a property owner's due process rights and, standing
5  alone, provides grounds for granting a writ of administrative mandate. *See id.*

6      205.   The Board abused its discretion and failed to follow the City's Rent
7  Control Scheme and other governing law by, among other things, awarding a $36.74
8  per space, per month rent increase. Even with this rent increase, Colony Cove will
9  still operate at a loss.

10     206.   As a result of these fundamental errors and omissions by the Board, its
11 decision as described herein denies Colony Cove *any* return – much less a fair return
12 – and also denies Colony Cove the rent increase to which it is entitled to under the
13 City's Rent Control Scheme and other governing law.

14

15 **PRAYER FOR RELIEF**

16     WHEREFORE, Plaintiff prays for judgment as follows:

17     A.     A declaration that that the City's Rent Control Scheme is
18 unconstitutional, invalid, and constitutes a violation of a park owner's substantive
19 due process rights in violation of the Fourteenth Amendment of the United States
20 Constitution.

21     B.     A declaration that the City's Rent Control Scheme is unconstitutional,
22 invalid, and/or constitutes an uncompensated taking in violation of the Takings
23 Clause of the Fifth Amendment of the United States Constitution.

24     C.     A declaration that the City's Rent Control Scheme as applied to Colony
25 Cove is unconstitutional, invalid, and does not provide Colony Cove a fair return.

26     D.     A declaration that approximately a $200 per space, per month, rent
27 increase is necessary to permit Colony Cove to earn a fair return on its investment.

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

-42-

E.     An injunction against the City and the Board preventing enforcement of the City's Rent Control Scheme, both generally, and specifically against Colony Cove.

F.     Damages and/or just compensation in an amount to be proven at trial, but no less than $34 million, as well as and alternatively nominal damages.

G.     A writ of administrative mandate vacating the City's decision with respect to Colony Cove's general and fair return rent increases and directing the City to reconsider the existing evidence.

H.     An award of attorneys' fees and costs.

I.     Such other and further relief as the Court deems just and proper.

DATED: October 27, 2008

GILCHRIST & RUTTER
Professional Corporation

&

O'MELVENY & MYERS LLP

By: _____
Kevin M. Yopp
Attorneys for Plaintiff
Colony Cove Properties, LLC

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000  ·  FAX (310) 394-4700

COMPLAINT

# EXHIBIT A

The following chart demonstrates the premium that mobilehome owners in Colony Cove receive as a result of the City's Rent Control Scheme.  The chart contains data regarding 49 sales of mobilehomes in Colony Cove that occurred during the last two years.  The column "Sale Price" is the price that the buyer paid the seller of each coach, which averages approximately $118,000. The true value of the coach according to the NADA Appraisal Guide and/or "Blue Book" is reflected in the column "NADA/Blue Book Value," which shows that the sold coaches in the Park on average were only worth approximately $33,000 without rent control.  The chart also shows the premium each coach owner received as a result of rent control, which is shown in the column "Premium."  The average premium paid for the right to acquire below-market rent by a purchaser of a mobilehome in Colony Cove was, on average, approximately $85,000.

| No. | Sale Price | NADA/Blue Book Value | Premium |
|-----|-----------|----------------------|---------|
| 1 | 198,470 | 69,788 | 128,682 |
| 2 | 219,000 | 45,508 | 173,492 |
| 3 | 180,000 | 48,086 | 131,914 |
| 4 | 79,900 | 17,286 | 62,614 |
| 5 | 50,000 | 22,221 | 27,779 |
| 6 | 110,500 | 21,026 | 89,474 |
| 7 | 200,000 | 55,216 | 144,784 |
| 8 | 110,000 | 16,685 | 93,315 |
| 9 | 100,000 | 20,579 | 79,421 |
| 10 | 85,000 | 13,905 | 71,095 |
| 11 | 93,000 | 19,252 | 73,748 |
| 12 | 85,000 | 19,346 | 65,654 |
| 13 | 188,295 | 63,719 | 124,576 |
| 14 | 193,963 | 50,143 | 143,820 |
| 15 | 140,000 | 65,728 | 74,272 |
| 16 | 50,000 | 21,858 | 28,142 |
| 17 | 129,000 | 56,138 | 72,862 |
| 18 | 187,000 | 63,602 | 123,398 |
| 19 | 98,000 | 14,369 | 83,631 |
| 20 | 205,000 | 48,526 | 156,474 |
| 21 | 110,000 | 23,176 | 86,824 |
| 22 | 210,575 | 49,456 | 161,119 |
| 23 | 120,000 | 27,278 | 92,722 |
| 24 | 46,000 | 8,943 | 37,057 |
| 25 | 150,076 | 67,988 | 82,088 |
| 26 | 196,000 | 93,372 | 102,628 |
| 27 | 210,000 | 64,051 | 145,949 |
| 28 | 84,500 | 12,045 | 72,455 |
| 29 | 30,000 | 19,079 | 10,921 |
| 30 | 98,000 | 19,806 | 78,194 |
| 31 | 78,000 | 24,566 | 53,434 |
| 32 | 79,000 | 17,861 | 61,139 |
| 33 | 91,700 | 12,045 | 79,655 |
| 34 | 99,000 | 19,374 | 79,626 |
| 35 | 120,000 | 14,522 | 105,478 |
| 36 | 65,000 | 18,947 | 46,053 |
| 37 | 70,000 | 16,520 | 53,480 |
| 38 | 87,000 | 13,519 | 73,481 |
| 39 | 95,000 | 16,970 | 78,030 |
| 40 | 75,000 | 21,858 | 53,142 |
| 41 | 85,000 | 21,943 | 63,057 |
| 42 | 61,500 | 7,300 | 54,200 |
| 43 | 123,000 | 16,444 | 106,556 |
| 44 | 79,900 | 22,631 | 57,269 |
| 45 | 92,000 | 16,550 | 75,450 |
| 46 | 149,000 | 43,960 | 105,041 |
| 47 | 111,000 | 43,391 | 67,609 |
| 48 | 129,000 | 43,391 | 85,609 |
| 49 | 139,000 | 72,191 | 66,809 |
| Averages: | | | |
| | 118,089 | 32,697 | 85,392 |

44

# EXHIBIT B

RESOLUTION NO. 2008-256

A RESOLUTION OF THE CARSON MOBILEHOME PARK
RENTAL REVIEW BOARD GRANTING A GENERAL RENT
INCREASE FOR COLONY COVE MOBILE ESTATES

WHEREAS, on or about October 1, 2007 an application was filed on behalf of COLONY COVE MOBILE ESTATES, 17700 South, Avalon Boulevard, Carson, California, 90746, (hereinafter referred to as the "Park") by COLONY COVE PROPERTIES, LLC, 2029 Century Park East, Suite 1450, Los Angeles, California, 90067, hereinafter referred to as the "Park Owner;" and

WHEREAS, the Park Owner requested a general rental increase of $618.15, per space, per month, for 403 of the 404 spaces in the Park; and

WHEREAS, the Park Owner's application was deemed incomplete in letter from staff dated October 23, 2007. After receipt of additional submissions from the Park Owner on October 23 and November 5, 2007, the application was deemed substantially complete on December 11, 2007; and

WHEREAS, staff mailed each resident a letter, on December 11, 2007, announcing that the Park Owner's application had been deemed substantially complete and that the same was available for public inspection and copying. The letter further stated that an appointed or approved resident representative could obtain a copy of the application request to assist the mobilehome Park residents in submitting factual information to the Board. The letter further stated that residents could submit letters, bills, photographs, and/or other relevant material to the City not later than January 11, 2008, at 6:00 p.m., for inclusion in the staff report to the Board; and

WHEREAS, notice of the time, date, and place of the hearing before the CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, hereinafter referred to as the "Board," was mailed on Thursday May 22, 2008 to the Board, the Park Owner, the Park Owner's representative, the residents' representative, and all affected residents in the Park. On Thursday June 5, 2008, staff transmitted copies of the Agenda to the City Clerk's office for posting in the manner required by law. The staff report to the Board was finalized and mailed or hand delivered to the Board, the Park Owner, the Park Owner's representative, and made available to the general public not later than Thursday, June 5, 2008.

NOW, THEREFORE, based upon substantial evidence taken from the record as a whole, and received at the hearing, both oral and written, including the staff report, the CARSON MOBILEHOME PARK RENTAL REVIEW BOARD does hereby FIND, DECLARE, and ORDER as follows:

/ / /

/ / /

/ / /

45

**Section 1**.

      a.      The Park, which is located at 17700 South Avalon, has 404 mobilehome spaces. These spaces are presently occupied by 347 double-wide, 56 single-wide, and one (1) triple-wide mobilehome.

      b.      The current rents of the 403 rental spaces in the Park range from $346.00 to $454.00 per mobilehome space per month. (One space is occupied by the Park manager, rather than being rented.) The average rent is $414.25. Water, sewer, and trash removal services are included in the rent structure, and are not for separately.

      c.      The Park Owner requested a rent increase of $618.05 in order to raise the average monthly space rents to $1,032.00. The percentage rent increase requested by the Park Owner ranged from 136% to 179%. (Rent Increase Application, p. 1, Exhibit A-1 & A-26 through A-33.)

      d.      This Park Owner purchased the Park in April 2006 for $23,050,060.00.

      e.      The Park Owner is claiming that it is entitled rent increases ranging from $208.22 to $618.05 per space, per month, based upon the following alternative methodologies and theories:

      (1)      <u>Return on Cash Investment</u>. A rent increase of $618.05 per space, per month based upon a return on cash investment methodology.

      (2)      <u>Return on Total Investment</u>. A rent increase of $365.93 per space, per month on the theory that this Park Owner is entitled to a 9% rate of return on its purchase price.

      (3)      <u>Gross Profits Maintenance ("GPM")</u>. A rent increase of $388.85 per space, per month based upon a Gross Profits Maintenance ("GPM") methodology.

      (4)      <u>Maintenance of Net Operating Income ("MNOI")</u>. A rent increase of $208.22 per space, per month based upon a maintenance net operating income ("MNOI") methodology.

      f.      Pursuant to the Mobilehome Space Rent Ordinance (the "Ordinance"), the Board is required to consider eleven (11) factors that are set forth in Section 4704(g), as well as "any other relevant factors" and to do so in consideration of certain "Guidelines" adopted pursuant to the Ordinance, with the obligation of arriving at a rent increase, if one is warranted, that assures a park owner a "fair return" while simultaneously protecting residents from "excessive rent increases." In undertaking this statutory obligation, this Board is admonished, by law, that "no one . . . factor shall be determinative" in awarding a rent increase nor does any one methodology guarantee any particular rent increase.

      g.      In applying the Guidelines, the Board is admonished to consider changes in income, expenses, profit, the consumer price index, maintenance, amenities, and services since *the date of the last rent increase approved by the Board*. The Guidelines state that:

"each rent increase application after the first application is evaluated *only* on the basis of changes in income, expenses, profit, the CPI, maintenance, amenities and services that have occurred *since the date of the last increase approved by the Board.*" (Guidelines, Sec. I.E.; emphasis added.)

h.    In September 2006, this Board adopted Resolution No. 2006-244 approving a general rent increase for this Park Owner of $6.23 per space, per month based on 2005 income and expense data.

i.    On December 27, 2006, the Park Owner appealed that decision of the Los Angeles County Superior Court in Case No. BS-106676.

j.    On May 21, 2008, the Superior Court upheld the Board's decision in all particulars, with the exception that it required that the Board provide its analytical basis for excluding $15,526.50 of operating expenses claimed by the park owner which this Board had reclassified as capital improvements. If these expenses, following reconsiderations scheduled to occur on July 30, 2008, are deemed to be operating expenses an additional rent adjustment of $3.21 per space, per month ($15,526.50/403 spaces/12 months) would be required. The Park Owner still has not yet exhausted its appellate remedies with respect to the Board's award pursuant to Resolution No. 2006-244.

**Section 2.**    The Ordinance, at Section 4704(g), requires that the Board consider the eleven (11) statutory and non-exclusive factors in considering whether to grant a rent increase, and to award such an increase in an amount that meets the dual obligation of this Board to assure this Park Owner a constitutional "fair return" while protecting residents of the Park from "excessive rent increases." Pursuant to this statutory obligation, and based upon the evidence considered as a whole, the Board makes the following specific findings:

a.    Inflation. Increases in the Consumer Price Index ("CPI-U").

(1)    In considering the prior rent increase application, the Board took into account the increases in the CPI-U from August 2006 through December 2007.

(2)    In August 2006, the CPI-U was 626.1 (CPI all-items all urban consumers, 1967=100)

(3)    As of December 2007, the CPI-U was 648.1.

(4)    Accordingly, the Board hereby finds that the percentage of change in the CPI-U is as follows:

| | | |
|---|---|---|
| CPI-U (August, 2006) | = | 626.1 |
| CPI-U (December 2007) | = | 648.1 |
| Percentage increase in CPI-U | = | **3.5%** |

(5)    . If the current rents were increased by the percentage increase in the CPI, the allowable rent increase would range from $12.16 to $15.94 per space, per month with an average increase of $14.56 per space, per month.

      b.    <u>Rents Lawfully Charged for Comparable Mobilehome Spaces in the City of Carson.</u>

(1)    Staff concluded that two mobilehome Parks in the City were comparable. These Parks are Carson Harbor Village, with an average rent of $543.35 and Imperial Avalon Mobile Estates with an average rent of $300.57.

(2)    The average rent of Colony Cove is at the mid-point of the average of the rents for the two comparable Parks.

(3).    The Park Owner submitted to this Board an analysis which, in part, requests that we compare the rents of this Park with the rents in parks *outside* the City of Carson, specifically Del Amo Mobile Estates and Dominguez Hills Estates. We respectfully decline the invitation to do so because our Guidelines require that comparability be based on comparisons with mobilehome parks *within* the City. Section III, Subsection (A), of the Guidelines provides:

> "A.    Comparable Parks. *The Ordinance directs the Board to consider rents in comparable parks in the City.* Consideration of the rents for spaces in comparable mobilehome parks can assist the Board in determining the range of reasonable rents for a particular park. *The reason the Ordinance specifies parks in the City is that comparison to rents in parks outside the City which are not subject to rent control would promote the excessive upward pressure on rents that the Ordinance is designed to avoid.* Rents in unregulated markets are the result of unequal bargaining power, which arises from the shortage of spaces for relocating homes and the cost and difficulties inherent in trying to relocate a home." (Emphasis added.)

      c.    <u>The Length of Time Since the Last Final Determination by Board on a Rent Increase Application.</u> The Board last granted a general rent increase to the prior Park owner in Sept. 27, 2006. The period of time from the last increase is approximately twenty-two months.

      d.    <u>The Completion of Any Capital Improvements.</u> Board staff recommended the removal of a total of $266,123.00 in claimed expenses from this general rent increase application on the basis that such expenses were a part of a major refurbishment of the Park and should therefore be handled as a separate temporary capital improvement rent increase. These individual expenses were noted in Exhibit-E of the staff report on pages E-17 through E-19 and appear to conform to the Revised Guidelines for the Implementation of the Ordinance, Section VI, A & B. We concur with staff's assessment of these expenses as rehabilitation, refurbishment and/or capital improvement expenses and have therefore removed these expenses from the general rent increase application.

The Park Owner has submitted a separate capital improvement rent increase application for these exact same expenses. A public hearing on that application is tentatively scheduled before the Board on Wednesday, August 27, 2008.

    e.    <u>Changes in Property Taxes</u>. On April 4, 2006 the Park was purchased by this Park Owner. Generally properties are reassessed at full market value when they are sold. The current property tax of the Park of $188,464 per year is based on an assessments $10,931,122 in FY 2005-06 and $11,149,743 in FY 2006-07.

In contrast, the Park Owner's purchase price was $23,050,060.00. The Park has not been yet been reassessed; however, as of the hearing before the Board, a reassessment at a value based on the purchase price and, therefore, an annual property tax of $307,526 appears to be a certainty. Because of the same, the Board has determined that it is appropriate to consider this amount of reasonably certain property taxes as an operating expense. The annual increase in property taxes based on such a reassessment will be $119,062 or $24.62 per space, per month.

    f.    <u>Utility Income and Expenses</u>.

    (1)    Common area electric costs increased by $4,364 between the base year and current year (from a total of $16,731 in 2005 to $21,095 in April 2006-March 2007.)

    (2)    Common area electric costs increased by $3,251 between the base year and current year (from a total of $17,847 in 2005 to $21,098 in April 2006-March 2007.)

    (3)    Water costs increased by $5,241 between the base year and current year (from a total of $79,850 in 2005 to $85,091 in April 2006-March 2007.)

    (4)    Common area electric costs increased by $4,145 between the base year and current year (from a total of $39,426 in 2005 to $43,571 in April 2006-March 2007.)

Utility costs are taken into account in the calculation of overall increases in operating and maintenance expenses elsewhere in these findings.

    g.    <u>Changes in Reasonable Operating and Maintenance Expenses</u>. The Park Owner submitted operating and maintenance expense data for the period April 2006 – March 2007. The Park Owner reported that operating and maintenance expenses increased by $749,408, (77.5%) between these two periods from $966,059 to $1,715,467. This increase is equal to $155 per space, per month.

/ / /

/ / /

/ / /

/ / /

In the application, the increase is primarily attributed to the following expenses:

Major Cost Increases Claimed by Park Owner

| Type of Expense | Base Year (2005) | Current Year (4/06-3/07) | Increase |
|---|---|---|---|
| Legal | $53,479 | $181,186 | $127,707 |
| Property Taxes | $172,001 | $416,597 | $244,596 |
| Landscape Maintenance | $16,983 | $148,027 | $131,044 |
| Other Maintenance | $37,141 | $184,375 | $147,234 |
| Other Professional Fees | $0.00 | $126,961 | $126,961 |

Staff recommended that, for each and all of the reasons set forth in the staff report which is a part of the record, adjustments should be made to these claimed expenses. Having carefully considered the staff report and the Park Owner's responses to the same, the Board concludes that these staff-recommended adjustments should be, and hereby are, accepted by the Board based on the reasons and the rationale set forth in the report (Exhibit E-16 to E-19).

(1)    Legal Expenses.  A substantial portion of the legal, professional, and license and permit expenditures were associated with efforts to undertake a condominium conversion of the Park and/or obtain amendments to the City's conversion ordinance. These are not expenses of operating the Park and providing any service to the Park residents.

(2)    Rehabilitation Expenses.  A substantial portion of the expenses are for long term replacements and improvements rather than recurring expenses. These expenses are capital improvement expenses rather than operating expenses.

The Board hereby finds and determines that, between 2005 to the period April 2006 - March 2007, operating expenses increased from $966,058 to $1,063,091, an increase of $97,033 or $22.06 per space, per month. The foregoing calculations of increases in operating and maintenance expenses do not include mortgage interest, which is considered in the GPM analysis and in the Park Owner's rate of return on cash investment claims.

h.    The Amount and Quality of Services in the Park.  The Board hereby adopts staffs' inspection of the Park and concludes that the Park is appropriately maintained. Park amenities include a large central clubhouse style building with a kitchen, banquet room/auditorium, swimming pool, Jacuzzi, billiard/card room, library/television room, exercise room, indoor spa, and other facilities.

A laundry room with coin-operated washers and dryers is also provided. A recreational vehicle storage area is available and the residents may rent spaces at an additional cost. A pet exercise run is provided for residents' use. The Park has a pay cable television service for commercial and pay television channels, which is provided at extra cost to the

residents. Park management will provide individual antennas to residents as a service provided within the rent structure.

Gated security services are provided on a 24-hour basis, and residents pay a fee of $48.00, per person, per year to partially offset this security cost. Water, sewer, and trash collection services are provided for the residents within the base rent.

**Section 3.** The Board has carefully considered the evidence, expert opinions, and legal arguments of the Park Owner regarding the various methodologies to be considered in complying with its statutory obligation to assure the Park Owner and fair return while at the same time protecting these Park residents from excessive rent increases. In doing so, the Board has further considered the expert opinions and testimony of two independent experts, engaged by City staff, to conduct an impartial evaluation of this application, and to make recommendations to this Board based upon such evaluations.

The Guidelines *require* the performance of a MNOI analysis (Section II.C.), the performance of gross a GPM analysis (Section II.B), and *authorizes* consideration of an Overall Rate of Return analysis (Section IV.A at 1-4). However, both the Ordinance and Guidelines make clear that a park owner is not entitled to any particular rent increase based upon the calculations derived from any one particular methodology.

a. <u>MNOI Methodology</u>. The courts have held that the MNOI standard is a "fairly constructed formula." In a case involving the application of the Escondido mobilehome rent ordinance which has rent adjustment standards which were modeled after those of Carson and furthermore are substantially identical to those of Carson, the Court of Appeal specifically upheld the use of the maintenance of net operating income (MNOI) methodology by the Escondido Mobilehome Rent Review Board. *Rainbow Disposal v. Mobilehome Park Rental Review Board*, 64 Cal.App.4th 1159, 1172 (1998).

In that case, the Court concluded that the MNOI formula is a "fairly constructed formula" which provides a ""just and reasonable" return on . . . investment," even if another formula may provide a higher return. In several cases, California appellate courts approved the MNOI method. In *Oceanside Mobilehome Park Owners' Ass'n v. City Oceanside* 157 Cal.App.3d.887 (1984) and *Baker v. City of Santa Monica*, 181 Cal.App.3d.972 (1986) California appellate courts upheld maintenance of net operating income fair return standards. In the *Oceanside* case the Court found that the standard was reasonable because it allowed an owner to maintain prior levels of profit. *Oceanside, supra,* 157 Cal.App.3d. at 902-05.

Accordingly, the Board finds that, applying the MNOI methodology, would produce a rent increase as follows:

(1) <u>Selection of Base Period</u>. Pursuant to Section I, E. of the Guidelines, the Board finds that the Base Period is 2005.

(2) <u>Net Operating Income in the Base Period</u>. In the base period, the net operating income ("NOI") of the Park was $1,102,737. This amount is equal to the actual

51

NOI of the Park in 2005 plus the $30,128 that was deemed appropriate by the Board in the 2006 hearing.

(3)   Operating Cost Increases from Base Period to Current Period. The operating and maintenance costs in the period April 2006-March 2007 were $ 1,063,019 (or $22.06/space/month) more than in 2005.

(4)   Adjustment of Net Operating Income Based on Increase in CPI-U. From the Dec. 2005 to March 2007, the CPI increased by 6.19%. An adjustment of the NOI based on 75% of the percentage increase in the CPI (4.64%) is $51,168.67 ($10.58/space/month).

(5)   Overall Rent Adjustment Based on an MNOI Methodology. The Board finds that applying an MNOI methodology would yield a rent increase of $177,676.64 or $36.74 per space, per month.

The Park Owner contends that a pre-rent control base year (1978) must be used in performing the MNOI calculations. The Board hereby finds that the Park Owner's contention is not supported by the law. The apparent rationale for using a pre-rent control base year urged by the Park Owner is that a pre-rent control base period used under an MNOI analysis has been supported by the City's independent expert, Dr. Kenneth Baar, in advising other rent controlled jurisdictions.[1]

However, the Board finds that the Guidelines command the use of the income that was deemed to be fair, just, and reasonable in the prior rent increase proceeding as the fair base period NOI. Moreover, Dr. Baar set forth rationale for using the prior rent adjustment as a base period in his reports to the Board, and we hereby adopt his analysis as follows:

---

[1]   The City's independent expert, Dr. Kenneth Baar, prepared a fair return analysis in this case. This Park Owner contends that Dr. Baar is not qualified to be an expert. The Board finds that Dr. Baar has a Ph.D. in urban planning and a law degree. Dr. Baar has served as a consultant to the World Bank and U.S. A.I.D. On two different occasions Dr. Baar has served as a Fulbright Fellow. Dr. Baar has published numerous articles in scholarly journals on housing, land use, and public policy issues. His articles have been published in eight different nations, and in seven different languages. Dr. Baar publications *on the issue of "fair return" under rent regulations* have been cited in six California appellate court decisions and two New Jersey Supreme Court opinions. His testimony on fair return issues has been relied on in four California appellate court opinions. Dr. Baar has prepared fair return analyses in 39 mobilehome space rent control cases for 15 cities and counties in California. In *Los Altos El Granada Investors v. City of Capitola*, 139 Cal.App.4th 629 (2006), the Court of Appeal rejected arguments that were virtually identical to the objections raised by the Park Owner and concluded that the Capitola Rent Board had ample grounds to qualify Baar as an expert. The Park Owner does not distinguish or even mention this precedent. The Board hereby finds that Dr. Baar is qualified, pursuant to Evidence Code § 720(a), to provide expert testimony on fair return issues and that such testimony can, in the discretion of this Board, constitute substantial evidence to sustain our findings and our decision.

"[T]he use of the original base year in the course of considering a subsequent application would constitute a 'reconsideration' of the evidence that provided the basis for . . . earlier determination[s]. Furthermore, it could result in . . . 'de facto' modification[s] of the prior decision[s] in the sense the outcome of the new decision could be based on a different conclusion about what rent increases were reasonable since the base year."

(Baar, Supplemental Analysis of Park Owner's Submissions of March 27 and May 29, 2008, p. 6, Staff Report, Exhibit-V, p. V-7.)

b. GPM Methodology. The Guidelines direct that current profit levels (defined as "net" income or income remaining after mortgage interest) shall be compared with the profit levels provided pursuant to the last rent increase. This type of methodology is called a "gross profits maintenance" ("GPM") analysis.

In the present application, a rent increase in the range of $196.23 to $200.93 is derived from performing a GPM analysis. Virtually the entirety of this amount is based upon the increase in debt service of $899,738 (from $354,405 to $1,245,143), an increase of $186.05 per space, per month. The Board finds that a rent increase based upon the GPM methodology would not be fair, just, or reasonable for the following reasons:

(1)     The guidelines provide that "[d]ebt service shall be considered as an allowable operating expense. Debt service obtained after the adoption the ordinance shall be an allowable operating expense to the extent that it is *reasonable in light of the existing rents* and prudent financing procedures. In this application, the debt service was not "reasonable in light of existing rents." The Park Owner notes that it has a substantial negative cash flow as a result of the new financing. The "reasonability of the debt service" was entirely dependent on the Park Owner's ability to obtain a substantial rent increase, rather than being reasonable in light of the existing rents.

(2)     Having considered the opinions of the various experts proffered to the Board, we hereby find that there is substantial rationale in this case for excluding the consideration of debt service in determining what would be a fair, just and reasonable rent increase. The City's independent expert that, "[f]rom a broader perspective consideration of mortgage interest and/or overall investment is "circular" in the context of a rent regulation. If mortgage interest becomes a determinant of the allowable return, the regulated owner becomes the regulator of the allowable return by virtue of establishing the level of debt service. The debt service obligation should be based on the permitted return under the regulation rather than being the determinant of the return." (Baar Report, February, 2008, p.16, Staff Report, Exhibit-D, p. D-20.)

(3)     In some prior applications, this Board has determined to utilize a GPM methodology to award a fair, just, and reasonable rent increase. In one case this Board permitted a rent increase of $76.71 per month, per space based on a park owner's increase in debt service. In every other application, however, the allowable rent increase based on changes in debt service was $23.13 per space, per month or less.

(4)     The allowance of a rent increase of $ 186.05 per space per month based on the increase in debt service, which was entirely within the control of Park Owner, would be contrary to the direction in the ordinance to which defines a rent increase as "fair, just, and reasonable" if it "protects Park residents from excessive rent increases." (Ordinance § 4704).

(5)     <u>Vested Rights Argument</u>.  The Park Owner claims that it has a vested right to a rent increase to cover the debt service it incurred in purchasing the property.  As noted, when the Park Owner purchased the property, the ordinance and guidelines both stated that there was no entitlement to a rent increase pursuant to any particular standard or formula. Furthermore, the section governing the type of analysis that considers debt service - the Gross Profits Maintenance Analysis - (Guidelines Section II.B.) includes the provision that "[t]he analysis is not intended to create any entitlement to any particular rent increase."

We note also that, in a reported appellate court decision addressing the very issue raised by this Park Owner, the Court specifically found that this Board in not mandated to rely upon or utilize any particular methodology and specifically mentioning the GPM methodology. *Carson Gardens, L.L.C. v. City of Carson Mobilehome Park Rental Review Bd.*,135 Cal.App.4th 856 (2006).  Accordingly, this Board finds that there is no basis in the Ordinance, the Guidelines, or case law for this Park Owner to claim a vested right to a rent increase based upon the calculations derived from a GPM analysis and/or an automatic right to pass through its increase in debt service.

d.     <u>Rate of Return Methodology</u>.  Under the Guidelines, park owners are authorized to submit, and the Board is authorized to consider, an owner's "Overall Rate of Return," which is defined as the "ratio of net operating income to purchase price."  The appraisal report submitted by the Park Owner reported that when the Park was purchased in 2006 the projected ratio of net operating income to purchase price was 4.75%.  This ratio was used to justify the purchase price.

The Park Owner now contends that it is entitled to a 9% ratio of net operating income to purchase price.  The net operating income to purchase price ratio of 9% that the Park Owner contends is required in order to permit a fair return is approximately double the 4.75 ratio that established by setting the purchase price and used to justify the purchase price.  The Board has carefully considered the various testimony of the experts proffered on this methodology.

For the reasons set forth in the written reports prepared by, and the testimony provided by, the City's independent experts, Dr. Kenneth Baar and Mr. Jim Brabant, the Board hereby finds the return on investment approach proposed by the Park Owner would completely undermine the purposes of the Ordinance, and would defeat the dual statutory obligations of this Board to assure a "fair return" while at the same time protecting residents from "excessive rents."

As the City's independent expert appraiser, Mr. Brabant, noted: "If you perform an analysis that uses one rate to justify a purchase price and then use a higher rate for the fair

return analysis, a rent increase will always be indicated. . . . In my judgment this amounts to an unjustified redefining of 'fair return.'" (Brabant Report, p. 4, Staff Report, Exhibit-W, p. W-4.)

In addition, the City's independent expert, Dr. Baar, noted in his discussion of fair return issues (which was submitted by the Park Owner for this Board's consideration):

> "By assuring that rents will be adequate to cover mortgage payments and provide for a return on equity, the return-on-equity standard in effect guarantees that any investment will be reasonable. Owners who pay the most . . . are permitted to charge the highest rents. Since investment is a business decision which is governed by expectations as to future income, the use of investment as a measure of what income shall be permitted defeats the purpose of price regulation. . . . Such a standard permits the regulated to regulate the rents."

(Baar, "Guidelines for Drafting Rent Control Laws: Lessons of a Decade", 35 Rutgers Law Review p. 792 (1983) [Park Owners May 29, 2008 submission; Exhibit M, p. M-87].)

e.    <u>Return on Cash Investment Methodology</u>. The Park Owner justified its return on cash investment claim justifying a $618.05 on the basis of an analysis by its expert Mr. John Neet. However, Mr. Neet subsequently concurred with the conclusion of the City's expert, Mr. James Brabant, that this analysis produced a meaningless result. (Letter from Neet, June 9, 2008, p. 3, discussion regarding Item No. 5, Park Owner's Exhibit X, p. X-6.)

f.    Finally, the Board finds that any rent adjustment granted pursuant to the prior application, including adjustments that may be made in the future, should be taken into account for the purposes of establishing the base rent and the allowable rent increase pursuant to the current application. In the event that a rent increase is awarded pursuant to the prior application subsequent to the Board's resolution on this application, this resolution shall be modified to include the additional rent increase.

## Section 4.

a.    The Board hereby determines, based upon the findings contained in Section 1 that it would be fair, just, and reasonable to grant a rent increase for 403 of the 404 rent controlled spaces in the Park. Having fully reviewed the Park Owner's application, and submittals, and resident submittals, and based on income and expense documentation, and the testimony of the witnesses at the hearing on this application, and having fully and carefully considered Factor Numbers 1 through 11, as outlined in the Mobilehome Space Rent Control Ordinance and the Implementation Guidelines, the Board hereby grants the Park Owner a rent increase of $36.74 (or 8.10% to 10.62 %) per space, per month, for 403 of the 404 rent controlled spaces in the Park, and as set forth in Exhibit "A" attached hereto and incorporated herein by this reference.

b.    Municipal Code § 4704(j) provides that, where the "Board's inability to make a timely decision is not due to the conduct of the . . . Park Owner, or some cause beyond the Board's control, such as, but not limited to, fire, earthquake or flood, the Board shall at the time it grants any rent increase . . . grant a temporary additional rent increase to the applicant to compensate the applicant for the difference between the rental income received between the time when an increase should have been granted . . . and that rental income that would have been

received if the increase had been timely granted." In the view of the Board, by February 24, 2007, an award should have been determined and written findings and a decision completed. Accordingly, the Board awards the Park Owner a one-time retroactive rent increase of $202.07 per space which we hereby authorize the residents to pay, should they so choose, in an single, lump sum payment (without interest), within 90 days of the date of this resolution, or in eleven (11) equal payments of $19.02 per space, per month (including interest at the rate of 7.04%).

        c.     The Board further finds and determines that such rent increase will raise the income of the Park by $177,675.00 on a yearly basis and that the same is fair, just, and reasonable based on the following additional findings:

        1.     Gross income for the Park increased by $33,441.00 or 1.7%, between 2003 and 2006.

        2.     Operating expenses for the Park including both the new debt service and the pending supplemental property taxes increased by $996,771.00 or 75.5 %, between the 2005 base period and the 2006-07 current period. (However, when excluding the increase in debt service, the Park's expense increase is only $97,032 or 7.5%.)

        3.     The CPI-U has increased by 3.51% between August 2006, (the most recent measurement available at the time of the Park's last general rent increase hearing) and December 2007 (Staff Report, pp. 7 & 8).

        4.     The current Park rents are currently at mid-point among the three parks in the City that are comparable.

        5.     The Park Owner's application and supplemental information make references to the years 1978, 1979 and/or another base year(s). However, the long-standing practice of this Board under the Ordinance, repeatedly upheld by the courts, is to review and evaluate *any* application for a general rent increase for the period of time since the Park's last general rent increase. This fact has been discussed at numerous public hearings, including past hearings involving another mobilehome Park owned by this Park Owner.

        6.     All calculations and statements which have references to 1978, 1979, or any other base year(s) have not been considered by the Board in its formulation of a decision for the current general rent increase application.

        7.     Moreover, prior court decisions have rejected this claim by this Park Owner, and while these court rulings were made in reference to another mobilehome Park, the City Attorney is of the legal opinion that the principles of *res judicata* will make those court decisions binding on this Park owner with respect to this Park as well.

/ / /

/ / /

/ / /

/ / /

**Section 5.**    Any challenge to this Resolution, and the findings set forth therein, must be filed within the 90 day statute of limitations set forth in Code of Civil Procedure § 1094.6 and Section 4708(c) of the Carson Municipal Code.

PASSED, APPROVED and ADOPTED this 6th day of August 2008.

CHAIR, CARSON MOBILEHOME PARK
RENTAL REVIEW BOARD

ATTEST:

SECRETARY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Jeffrey W. Johnson.

The case number on all documents filed with the Court should read as follows:

## CV08- 7065 PA (JWJx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division** | **[ ] Southern Division** | **[ ] Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Richard H. Close (Bar No. 50298)
Thomas W. Casparian (Bar No. 169763)
Kevin M. Yopp (Bar No. 218204)
Gilchrist & Rutter
1299 Ocean Avenue, Suite 900
Santa Monica, CA  90401
Tel:  (310) 393-4000 / Fax:  (310) 394-4700

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLONY COVE PROPERTIES, LLC, a Delaware limited liability company<br><br>PLAINTIFF(S)<br>v.<br>CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 50, inclusive<br>DEFENDANT(S). | CASE NUMBER<br><br>CV08-07065 PA (JWJx)<br><br><br>SUMMONS |

TO:   DEFENDANT(S):  to the above named defendants

        Within   20   days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, _Kevin M. Yopp_____, whose address is
_1299 Ocean Avenue, Suite 900, Santa Monica, California 90401_____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint. You also must file
your answer or motion with the court.

                                                        Clerk, U.S. District Court

Dated:   OCT 2 7 2008                   By: _____ NATALIE LONGORIA _____
                                                        Deputy Clerk

                                                        (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*                                        1198

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
COLONY COVE PROPERTIES, LLC

**DEFENDANTS**
CITY OF CARSON; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD; and DOES 1 to 50, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

See attached.

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

---

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT:** $ 34 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
42 U.S.C. § 1983 - Unconstitutional Rent Control Scheme

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☒ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

---

**FOR OFFICE USE ONLY:**   Case Number:   **CV08-07065**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                          CIVIL COVER SHEET                          Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                              ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                              ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                              ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐    Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐    Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER):  _____   Date  October 27, 2008

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT TO CIVIL CASE COVER SHEET

**I(b)** Attorneys:

Richard H. Close, Thomas W. Casparian, and Kevin M. Yopp
Gilchrist & Rutter
1299 Ocean Avenue, Suite 900
Santa Monica, California 90401-1000
Telephone: (310) 393-4000

Matthew W. Close
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000

165834
4541-023